22 P.3d 43

**STATE of Arizona, Appellee,**

v.

**Phillip Alan BOCHARSKI, Appellant.**

No. CR–97–0306–AP.

Supreme Court of Arizona.
En Banc.

May 3, 2001.

Janet A. Napolitano, Arizona Attorney General, by Randall M. Howe, Chief Counsel, Criminal Appeals Section, Kent E. Cattani, Assistant Attorney General, Phoenix, Attorneys for Appellee.

J. Douglas McVay, Phoenix, Attorney for Appellant.

## OPINION

ZLAKET, Chief Justice.

¶ 1 Defendant Phillip Alan Bocharski moved from Michigan to Arizona with Frank Sukis in November 1994. The two settled just outside the small town of Congress. The defendant initially stayed with Sukis, but in December moved to a well-populated campsite on Ghost Town Road. Around Christmas, Sukis gave the defendant a Kabar knife, slightly smaller than one he kept for himself. This knife was described by Bocharski as his "pride and joy," and he was frequently seen with it.

¶ 2 In April 1995, Sukis moved to a location near the defendant. Shortly thereafter, an eighty-four year old woman named Freeda Brown established a campsite between Bocharski and Sukis. She had a trailer, a truck, a dog, and numerous cats. When Brown first arrived, Sukis sold her some gas. He noted that "she reached in the back seat of her truck" and retrieved money to pay for the gas from "a plastic zip-lock bag with a little clutch purse inside it." The money smelled of cat litter, so he got rid of it as soon as possible.

¶ 3 Sukis lived on a disability pension from the federal government. Bocharski, on the other hand, seldom had money. Once in a while, he did odd jobs or yard work for folks in the area, but he also did a lot of "freeloadin'," as Sukis put it. At Sukis' suggestion, Brown hired Bocharski to drive her around and do errands because she had poor eyesight and arthritis. Witnesses later testified that the defendant often helped Brown, and the two of them appeared to have a good relationship.

¶ 4 On May 10, Sukis picked up Bocharski at the latter's tent. The two of them saw Brown polishing her truck, but did not stop to speak with her. Bocharski and Sukis then drove to the local food bank and obtained three boxes of food. One box was for their friends, Richard Towell and Mary Beth Anglin, who lived in a remote campsite and had no transportation. Sukis later testified that while on their way to the Towell/Anglin campsite, the defendant suggested "maybe he should offer [sic] or get rid of [Brown], on account of her arthritis, 'cause she was complaining all the time, she was praying God he'd take her out of her misery."

¶ 5 After Sukis and Bocharski left the campsite, they drove to a local bar. Once there, Sukis loaned the defendant ten dollars so he could get something to drink. Bocharski said he needed to call a man in Wickenburg about a masonry job in Prescott, for which he was to receive $500 in advance. Sukis testified that the defendant appeared to make two attempts to reach this unidentified employer by phone. Thereafter, the men discussed a hiding place for the money, if and when it was received, with Sukis suggesting a spot underneath a big rock by his television antenna.

¶ 6 The next morning, Sukis was late picking up Bocharski. He met the defendant walking toward him along the road. As a result, he had no occasion to drive past Brown's campsite. Bocharski indicated that since the two men had last seen one another, he had gone back to town and "called the guy and had him drop the money off over at the library, or in back of the library, underneath the propane tank." Bocharski had no vehicle. According to Sukis, the nearest phone was about a "mile, mile and a half" away from the defendant's place.

¶ 7 When they reached the library, Bocharski returned some books and went behind the building for five to ten minutes. He reappeared with $500 in $50 bills, wrapped in a piece of newspaper. Bocharski immediately gave Sukis $150 to fix his truck and bought some beer and tobacco for a friend, Jerry Stanberry. According to Sukis, the money did not smell of cat litter. The two men then drove to Stanberry's house. A fellow named Duane Staley was there when they arrived. Staley later testified that Bocharski had his shirt and shoes off and looked like he had recently taken a shower. However, nothing in the evidence indicated when or where he might have done so.

¶ 8 At trial, Stanberry claimed that the defendant told him Freeda Brown "was feeling kind'a blue and useless because she was crippled, couldn't get around very much anymore and she was planning on shooting her-

self ... [and] that he [Bocharski] felt sorry for her, which we all did. But he said she might be better off if somebody would knock the old biddy in the head."[1] Stanberry admitted that he had never mentioned this to the police or in his pretrial statements.

¶ 9 After leaving Stanberry's house, Bocharski and Sukis drove to the Towell/Anglin campsite. According to Sukis, the defendant then told him that the money he had picked up was actually for a "hit job" in Prescott. Sukis replied that he did not believe Bocharski.

¶ 10 After the men arrived at the campsite, Sukis and Anglin left to get groceries. According to Towell, Bocharski was in a "very high pitch of excitement," and "twitchy." When Towell inquired why, Bocharski purportedly said that he was "in serious trouble" because he had robbed and killed an "old lady" at her trailer in Congress. He explained that he had been "in a panic, that he needed money and he needed food." He further stated that he got five hundred dollars from the victim, and that no weapon or fingerprints would be found. Finally, he asked Towell if Sukis could be trusted with "a secret." Towell said no, and made specific reference to Sukis' alcoholism. Later that day, the defendant allegedly asked Towell to provide an alibi for him, but the latter refused.

¶ 11 When Sukis and Anglin returned, Bocharski announced that he would be staying at the campsite for a while and if a man came looking for him about a job, Sukis should let that person know where he was. The defendant later gave Towell and Anglin two hundred fifty dollars for the purchase of food and drink. Towell testified that Bocharski indicated this was "part of the money he got when he killed the old lady." Towell claimed that he did not believe the defendant at the time.

¶ 12 On Bocharski's second night at the camp, Towell awoke to find him "cryin', settin' on the side of the bed." The defendant again said "he was in serious trouble, what

was he gonna do." According to Towell, Bocharski "was worried about himself."

¶ 13 On May 13, Duane Staley noticed that Freeda Brown's dog had no water and its leash was wrapped around a tree. He had not seen Brown in a while and grew concerned. He knocked on her trailer door and tried to open it. He then obtained help from Sukis, who got inside and found Brown's body on the bed, covered by a blanket. Staley went to call the Sheriff's Department while Sukis stayed at the location.

¶ 14 The officer who arrived at the trailer observed that the woman's body had already begun to decompose. He concluded that her death was due to natural causes. He assumed that Brown's appearance—her head was covered in blood and other matter—was due to cats having nibbled at her face. There were no signs of a struggle. He therefore made no attempt to preserve the scene and had a mortuary pick up the body. He also called Brown's apparent beneficiaries, the Hadlocks, to come get the trailer. Brown had posted many notes around her truck and trailer explaining that upon her death, all belongings should go to the Hadlocks.

¶ 15 On May 14, the Hadlocks drove to Congress, picked up the trailer, and parked it in Quartzsite. Meanwhile, the medical examiner told police that she suspected Brown's death was not the result of natural causes. A subsequent autopsy disclosed that Brown had perished as a result of at least sixteen stab wounds to the head.

¶ 16 The next morning, the police called the Hadlocks and left a message telling them not to do anything to the trailer. By the time they received the message, however, the Hadlocks had already sprayed Lysol in parts of the trailer and emptied its contents into garbage bags. In a previous letter to Mrs. Hadlock, Brown explained that "she kept her money hidden inside her .38 holster underneath the bed inside the camper." Mrs.

---

1. According to Stanberry, Bocharski also said that he wanted to borrow money from Brown because "she wasn't payin' him enough," but "she'd get angry if he kept on her about it." In addition, Stanberry testified that the defendant indicated Brown kept money "in a bag ... behind the truck seat in her pickup."

Hadlock looked and found $500 in that location.

¶ 17 On May 16, the police examined Brown's trailer and belongings. Blood found in the trailer was tested and determined to be Brown's. That same day, the sheriff executed a SWAT team raid on the Towell/Anglin campsite. An officer asked Towell whether Bocharski had ever mentioned anything about an old lady in Congress. Towell registered surprise, and immediately replied that the defendant had said he "killed that old lady for five hundred dollars."

¶ 18 Towell also told the police that Bocharski was wearing khaki shorts and tennis shoes on May 10, and jeans and boots on May 11. The police never found the shorts or tennis shoes, but in searching Bocharski's campsite they discovered a Levis button and three eyelets in the campfire. Based on statements made by Sukis and Towell, officers searched around a mine and a nearby cemetery in hopes of finding Bocharski's Kabar knife, which was last seen by any witness three months before the killing. The knife was never located.[2] In fact, no murder weapon was ever found. Subsequent tests showed that blood found on the defendant's belongings was his own. Two of his fingerprints were found on the door of the deceased's trailer, but could not be dated.

¶ 19 The defendant did not testify at his trial. He was convicted of first degree felony murder and first degree burglary. The jury also found that the state's allegation of a prior felony conviction[3] was true. Bocharski was sentenced to twenty-one years imprisonment on the burglary charge, and to death for the murder. We review this case on direct, automatic appeal pursuant to Ariz. Const. art. VI, § 5(3), Ariz.Rev.Stat. § 13–4031, and Ariz. R.Crim. P. 31.2(b).

## TRIAL ISSUES

### A. GRUESOME PHOTOGRAPHS

¶ 20 The trial court allowed six photographs into evidence over defense counsel's objection that they were gruesome, highly inflammatory, and unduly prejudicial:

*Exhibit 42:* the victim's clothed body, showing gross marbling of the skin, discoloration of the face, and fluid coming from both the nose and mouth;

*Exhibit 43:* a closeup of the victim's face in profile before it was cleaned

*Exhibit 44:* the victim's torso and face after the body had been washed and her head had been shaved to make the wounds more visible;

*Exhibit 45:* a closeup of the victim's hand and finger; and

*Exhibits 46, 47:* views of the victim's skull, the top and its contents having been removed, with a metal rod going through an opening to the inside.

¶ 21 Relevant photographs may be received in evidence even though they "also have a tendency to prejudice the jury against the person who committed the offense." *State v. Chapple,* 135 Ariz. 281, 287–288, 660 P.2d 1208, 1214–1215 (1983) (quoting *State v. Mohr,* 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970)). This does not mean, however, that every relevant photograph should automatically be admitted. If a photograph "is of a nature to incite passion or inflame the jury," *id.,* the court must determine whether the danger of unfair prejudice substantially outweighs the exhibit's probative value. Ariz. R. Evid. 403. A trial court's decision in this regard will generally not be disturbed unless we find a clear abuse of discretion. *State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990).

¶ 22 Bocharski concedes that the photographs of the victim's body were relevant. We agree. Rule 401 declares that evidence which has "*any tendency* to make the existence of any *fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Ariz. R. Evid. 401 (emphasis added). We have previously recognized that the state has the burden of

---

2. Towell testified that when Bocharski was staying with him and Anglin in the days before his arrest, he had no knife, and borrowed one to cut a piece of meat.

3. For burglary.

proving every element of first degree murder. *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215. We have also suggested that photographs of a homicide victim's body are generally admissible because "the fact and cause of death are always relevant in a murder case." *State v. Harding*, 141 Ariz. 492, 499, 687 P.2d 1247, 1254 (1984) (quoting *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215).

¶ 23 However, if a defendant does not contest the "fact that is of consequence," Ariz. R. Evid. 401, then a relevant exhibit's probative value may be minimal. Under such circumstances, gruesome photographs may "have little use or purpose except to inflame," *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215, and their prejudicial effect can be significant. In the present case, the photographs introduced by the state went to largely uncontested issues. The defense did not challenge the fact of the victim's death, the extent of her injuries, or the manner of her demise.

¶ 24 Exhibits 42 and 43 depict both the state of the body's decomposition and facial wounds. There was some question about how long the victim had been dead before she was found. This was discussed by the medical examiner and a forensic pathologist who performed the autopsy. The witnesses could not ascertain an exact time of death, only coming within a few days in their estimates. Moreover, while diagrams were available to depict the size and location of the deceased's most profound injuries, the state introduced exhibit 44 to show superficial head wounds, and exhibit 45 to show a cut on the victim's finger. Testimony indicated that the latter was not a defensive wound, making its significance marginal at best.

¶ 25 Nevertheless, we do not conclude that the trial court abused its discretion by admitting Exhibits 42–45. The state "cannot be compelled to try its case in a sterile setting." *Chapple*, 135 Ariz. at 289–290, 660 P.2d at 1216–17. We are, however, concerned about the admission of Exhibits 46 and 47. Their admission was unnecessary

and quite risky. The state contends that these photos were required to show the angles and depths of the penetrating wounds. According to the state, this information was important because a juror asked the medical examiner about it. The defense argues that the photographs had no probative value; the manner of the victim's death was not in issue and the photographs failed to show that the defendant's missing knife caused the wounds.

¶ 26 The trial judge originally allowed exhibits 46 and 47 to be admitted for the purpose of showing the angles of the wounds. However, the prosecutor did not elicit testimony concerning these angles or their significance. Indeed, there was no testimony at trial rendering exhibits 46 and 47 particularly meaningful.[4] The photographs do not reveal what type of knife was used, nor did the prosecutor refer to them when examining witnesses regarding a possible murder weapon. Although the pictures met the bare minimum standard of relevance—what we referred to as "mere technical relevance" in *Chapple*, 135 Ariz. at 288, 660 P.2d at 1216— they had little tendency to establish any disputed issue in the case. Accordingly, we are left to conclude that they were introduced primarily to inflame the jury. *Id.*

¶ 27 Let us again make clear that not every relevant photograph is admissible. Trial courts have broad discretion in admitting photographs. *State v. Spreitz*, 190 Ariz. 129, 141, 945 P.2d 1260, 1272 (1997). However, judges also have an obligation to weigh the prejudice caused by a gruesome picture against its probative value. *State v. Beers*, 8 Ariz.App. 534, 539, 448 P.2d 104, 109 (1968); Ariz. R. Evid. 403. In the present case, the record reflects that the trial judge conducted a Rule 403 weighing. In our view, however, he reached the wrong conclusion with regard to Exhibits 46 and 47. These two photos should not have been admitted.

¶ 28 This, however, does not end our inquiry. We still must determine whether "we can say beyond a reasonable doubt, that

---

4. When the defendant moved for a mistrial, the judge held that the photographs were helpful in showing wound depths. At oral argument before this court, the state additionally argued that the

photographs tended to show the ferocity of the attack and that the victim was likely held down while being repeatedly stabbed.

the error did not contribute to or affect the jury's verdict." *State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). Our focus is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *State v. East- lack,* 180 Ariz. 243, 251, 883 P.2d 999, 1007 (1994) (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

¶ 29 Here, the photographs of the corpse were startling, as evidenced by the jurors' visible reactions to them. In particular, two jurors showed physical signs of distress upon seeing Exhibits 42, 43, and 44, with one of them apparently trying to prevent herself from hyperventilating. The judge noted on the record that after seeing these reactions to the first group of photographs, he "watched [the jurors] closely as they passed around Forty-six and Forty-seven." His ob- servation that "they seemed to take them in stride" is uncontroverted. Bocharski has not shown that Exhibits 46 and 47 had a particu- larly adverse effect on this jury.

¶ 30 It is true, as the defense asserts, that the only physical evidence tying Bocharski to the crime scene were two fingerprints that could not be dated. As the defendant notes, these were not particularly significant, given his relationship with the victim. In addition, despite a thorough search, the police never recovered the murder weapon. Although the prosecutor argued that Bocharski's missing knife could have inflicted the victim's wounds and that the defendant likely disposed of the weapon, no connection was conclusively es- tablished. Thus, the defendant claims that the state's case was terribly weak, making the photographs especially damaging. But this argument overlooks Bocharski's highly inculpatory statements, and the far-fetched explanations he gave for the money in his possession.

¶ 31 According to the state's theory of the case, Bocharski concocted the story about prospective employment. The prosecutor emphasized the unlikelihood that any real employer would leave $500 in cash under a propane tank behind a library for construc- tion work to be performed in the future. The story, he argued, was even more fantas- tic considering that the purported recipient, Bocharski, was a relative newcomer to the area who lived in a tent outside of this re- mote venue. The out-of-town employer was never identified, nor did any witness at trial corroborate his or her existence.

¶ 32 The state asserted that the defendant killed the victim, stole her money, disposed of the murder weapon, went to the library, hid the money underneath the propane tank, re- turned home, and burned his clothes beyond recognition except for a Levis button and three eyelets. Thus, aided by an incomplete police investigation, Bocharski was able to eliminate every physical trace of his involve- ment in this crime.

¶ 33 The state's theory was certainly sup- ported by damaging admissions made by the defendant to Sukis, Towell, Stanberry, and a fellow inmate at the Yavapai County jail, Donald Fields. The defense counters that these witnesses were vulnerable to attack by virtue of their inconsistent statements, ques- tionable backgrounds, and personal habits. Substance abuse and mental illness were sig- nificant features of their individual histories. But the jury was able to evaluate these weaknesses, all of which were exposed at trial.

¶ 34 The state's proof, though not ironclad, was more than sufficient to support the de- fendant's conviction. Nothing before us sug- gests that the jurors' thoughtful consider- ation of the evidence was hampered by the objectionable photographs. Their verdict re- flects careful attention to detail. Indeed, they chose felony murder instead of premedi- tated murder—a distinction that might easily have been overlooked if the verdict had been attributable to outrage or emotion generated by the gruesome pictures. *Cf. State v. Rush- ing,* 156 Ariz. 1, 3, 749 P.2d 910, 912 (1988) (lack of juror passion indicated by conviction of lesser-included offense). Accordingly, we find beyond a reasonable doubt that the er- ror in admitting Exhibits 46 and 47 did not contribute to or affect the jury's verdict.

## B. STIPULATED TESTIMONY

¶ 35 While awaiting trial, the defendant was allegedly involved in an assault on a fellow inmate, Donald Fields, in the Yavapai County jail. Fields was inadvertently placed near another prisoner who had been arrested by the police with Field's assistance. He testified at a pretrial hearing that this prisoner attacked him in the presence of other inmates, several of whom joined in beating him for seven or eight hours. Fields alleged that during the altercation the defendant put a stick up to his throat several times and threatened him.

¶ 36 Over repeated objections, the trial judge ruled that this witness could testify to Bocharski's statements. The testimony was admitted in the form of a stipulation, although nothing in the record discloses why the witness did not appear in person. The stipulation was as follows:

> Don Fields was arrested on January 15, 1996 for not paying a traffic ticket; he was taken to the Prescott Jail. By coincidence he was put in Jail with the person he helped catch the previous September, 1995. This person had taken a lady's purse at Albertson's in Prescott and Mr. Fields had helped to catch him. The fact that Mr. Fields had helped to catch this person became generally known to people in the jail cell.
>
> Mr. Bocharski was in that jail area and he approached Mr. Fields. Mr. Bocharski told Mr. Fields, I'm in here for murder and there's nothing they can do to me. If it were up to me, you would be dead right now.
>
> At a separate time Mr. Bocharski told Mr. Fields, I'm in here for murder because of a snitch like you.
>
> Mr. Bocharski made these statements to Mr. Fields in a serious and threatening manner.

¶ 37 Defendant claims that the trial judge committed reversible error in admitting this evidence. Rule 801(d)(2) provides that an admission by a party opponent is not hearsay and is therefore admissible if offered against the person who made it. As a prerequisite to admissibility, however, party admissions must be relevant. *See* Ariz. R. Evid. 401, 402.

■ ¶ 38 Only one part of the stipulation causes us concern. The defendant's alleged statement, "[i]f it were up to me, you would be dead right now," had no relevance to the conduct at issue here. It did not relate to the victim or to the crime of which the defendant was accused. At most, it was used to show Bocharski's propensity for violence, and to imply that he acted in conformity with that trait. Such evidence is improper unless the defendant has put his own character in issue. *State v. Rankovich,* 159 Ariz. 116, 120, 765 P.2d 518, 522 (1988); Ariz. R. Evid. 404(a). Therefore, the judge erred in admitting this statement.

■ ¶ 39 Again, however, we view the error as harmless, given the other statements made by the defendant on the same occasion, as well as earlier in time. *Supra,* at ¶¶ 10–12. We find beyond a reasonable doubt that this one statement had no impact on the verdict.

## C. MANSLAUGHTER INSTRUCTION

■ ¶ 40 The defendant claims that the trial court should have given a jury instruction on manslaughter, arguing that it was a lesser-included offense. He rests this claim solely on the testimony of Richard Towell, who related Bocharski's statement about being "in a panic, that he needed money and needed food." *Supra,* at ¶ 10. We view this single piece of evidence as insufficient to warrant a finding that the homicide was committed either "recklessly" or "upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim." Ariz. Rev.Stat. § 13–1103(A). The evidence did not justify a manslaughter instruction. *State v. Lamb,* 142 Ariz. 463, 472, 690 P.2d 764, 773 (1984).

■ ¶ 41 Additionally, the jurors eschewed first degree premeditated murder and second degree murder, both of which were covered by the instructions. Instead, they found the defendant guilty of first degree felony-murder, which has no lesser included offenses. *State v. West,* 176 Ariz. 432, 443, 862 P.2d 192, 203 (1993); *see also State*

*v. Amaya–Ruiz,* 166 Ariz. 152, 174, 800 P.2d 1260, 1282 (1990) ("[W]hen a defendant is convicted of first degree murder rather than second degree murder, any error as to instructions on lesser included offenses is necessarily harmless, because the jury has necessarily rejected all lesser-included crimes.").

## D. DESTRUCTION OF EVIDENCE

¶ 42 Bocharski moved to dismiss the charges below because the government failed to preserve evidence. The motion was denied. The defendant concedes that there was no bad faith on the part of the sheriff's deputies who failed to safeguard the scene where the body was found, or to gather other physical evidence that might have been available. He urges, however, that we discard the bad faith requirement of *State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152 (1993), and instead adopt the dissent's approach in that case, as follows:

[W]hen the government loses potentially exculpatory evidence, the trial court must "balance the degree of culpability of the government, the materiality of the evidence, and the potential prejudice to the defendant in order to protect the defendant's constitutional due process right to a fair trial.... If the loss of the evidence threatened the defendant's right to a fair trial, the judge has discretion concerning the manner in which to protect the defendant's rights."

Id. at 514, 844 P.2d at 1164 (Feldman, J. dissenting)(quoting *Commonwealth v. Henderson,* 411 Mass. 309, 582 N.E.2d 496, 496–97 (1991)). We decline this invitation.

¶ 43 However, even were we to adopt this balancing strategy, it would not help Bocharski's cause. Though the police work was admittedly inadequate, the defendant fails to provide even a hint of what exculpatory evidence there might have been. Additionally, the "culpability of the government" is hardly egregious. The decomposing body of an 84 year old woman, bearing no immediately obvious signs of trauma, was found in her own trailer. There was no indication of a struggle. At worst, the officer on the scene was negligent. There was no deliberate effort to destroy anything. We also note that the trial

court gave a *Willits* jury instruction concerning the state's failure to preserve evidence. *See State v. Willits,* 96 Ariz. 184, 191, 393 P.2d 274, 279 (1964). Thus, the jurors were free to consider this less-than-ideal police work in deciding the matter.

## SENTENCING ISSUES

### A. MITIGATION

¶ 44 Defendant paints an unhappy picture regarding his difficulty in obtaining a thorough mitigation investigation. As best we can tell, the presiding judge of Yavapai County initially ordered an appropriation of $1500 to begin the work. A second request for funds was denied. The third request resulted in an additional grant of $2500. Although more money was eventually allocated, the record is not clear as to its timing or amount. Approval generally took 30 to 45 days from the submission of requests, extending the time in which Mary Durand, a highly experienced mitigation specialist, was forced to perform her duties. It is clear that the defendant struggled to obtain funding during the entire presentencing period, including an eight-week hiatus in which he was essentially prevented from continuing the mitigation investigation because of the county's reluctance to pay for it.

¶ 45 On April 28, 1997, Durand testified at a presentence hearing that in her experience the average cost of a mitigation investigation "is about 20 to $100,000. The average in the State of California is 150 [thousand]." Durand indicated that this particular case would, at a minimum, require her to travel to three states in order to interview the defendant's mother, wife, and foster parents. She noted that Maricopa County, for whom she regularly worked as a mitigation specialist, never denied her a trip in the course of an investigation because of the importance of conducting a thorough examination.

¶ 46 At a hearing on July 21, Bocharski's sentencing date was extended to give defense counsel an opportunity to request additional funding for the transportation of witnesses. The defendant reluctantly agreed, expressing concern that the date would be postponed only to have funding denied again. However,

almost immediately thereafter Bocharski changed his mind, which led to the following extraordinary series of events.

¶ 47 The defendant sent a letter to the judge requesting that the sentencing occur without his attorneys being present. Upon receiving this correspondence on July 29, the judge called an impromptu sentencing hearing. Because of the extremely short notice, only Bocharski's trial attorney (who was not involved in the sentencing and was only present because he happened to be at the courthouse) and a substitute prosecutor were initially available. The original prosecutor and the other defense attorney arrived while the hearing was in progress.

¶ 48 Bocharski told the judge that his decision to expedite sentencing was based in part on the previous denials of mitigation funding and the uncertainty in making yet another request. The defendant indicated that he did not "want any more motions to be made towards funding or anything like that. That's—I'm done asking." He also said this decision was based on his belief that further mitigation evidence would not affect the judge's decision and would be cumulative.

¶ 49 The prosecutor argued in favor of waiting for the testimony—either in person or telephonically—of key witnesses. He also suggested that the mitigation specialist should be subpoenaed to appear. This argument was apparently designed to prevent the defense from raising the funding issue on appeal. Nevertheless, the court proceeded to sentence Bocharski after accepting his "waiver" of further witnesses.

■■■ ¶ 50 We are initially troubled by the defense's difficulty in obtaining funds to support the mitigation investigation. In every capital case, the court is required to consider the defendant's background before imposing sentence. *Lockett v. Ohio*, 438 U.S. 586, 601–04, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). A mitigation specialist is "an individual who specializes in compiling potentially mitigating information about the accused in a capital case"; this individual aids defendants in "presenting favorable evidence to the factfinder in the penalty phase of trial." *State v. Langley*, 314 Or. 247, 839 P.2d 692, 697 (1992); *see also* Jonathan P. Tomes, *Damned*

*If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 Am. J.Crim. L. 359, 366 (1997).

■■■ ¶ 51 Here, decisions concerning mitigation expenditures were apparently left to the county's presiding judge. In our view, however, the trial judge should play the most important role in determining whether additional funds are necessary. *See State v. Cornell*, 179 Ariz. 314, 332, 878 P.2d 1352, 1370 (1994) ("A trial court has broad discretion in managing the conduct of a trial, and has a duty to properly exercise that discretion.").

¶ 52 Here, the trial judge openly expressed concern that the defendant's decision to end the mitigation investigation was based on a lack of funding. He also admitted that he could imagine other evidence which might be important to sentencing, but acknowledged that this was mere speculation until such proof was presented. In addition, both the prosecutor and defense counsel spoke of their reluctance to proceed under these circumstances.

¶ 53 A red flag is raised when sentencing is expedited based solely on the defendant's desire to speed up the process. Part of Bocharski's motivation was his apparent frustration with obtaining funding for the mitigation specialist. In addition, he may have been reluctant to hear witnesses describing the horrifying events of his childhood, which he sought to avoid by disposing of a hearing. Finally, it was alleged that the defendant was extremely concerned about conditions at the Yavapai County jail and perceived that the Department of Corrections offered a better living environment.

¶ 54 The trial court expedited the matter based solely on the defendant's request, even though there was no finding that a sentencing delay would prejudice anyone. Despite vigorous opposition, the judge relied on the defendant's waiver of further mitigation evidence. Bocharski's lawyers stated that they still had research to complete and expressed confusion over their role in the proceedings due to the defendant's written request to be sentenced without an attorney present. One of them explained that

should [defense counsel's] motion to continue be denied, I believe it would be my ethical obligation to move to withdraw on the basis, that I personally cannot provide him what I believe to be adequate representation in regards to sentencing, given the sum total of the circumstances surrounding the mitigation work.

The judge never ruled on this request to withdraw and so the attorneys were forced to make impromptu arguments. The decision to proceed clearly left them surprised and unprepared.

¶ 55 It also appears that out of this sudden rush to sentence came an instantaneous special verdict. Although he initiated the sentencing immediately upon receiving the defendant's letter, the judge managed to present his special verdict to the attorneys right after rejecting their pleas to continue the mitigation hearing. Indeed, his written special verdict was filed and stamped by the clerk of the court on July 29, the very same day. The whole process leaves us with an uneasy feeling and very little to independently reweigh.

¶ 56 While it is true that a defendant can waive certain rights, such a waiver must be balanced against the state's interest in conducting a fair trial and upholding the integrity of the judicial process. *See, e.g., State v. Henry,* 189 Ariz. 542, 550, 944 P.2d 57, 65 (1997) ("Motions for self-representation must be balanced against the 'government's right to a fair trial conducted in a judicious, orderly fashion.' ") (citations omitted). A further limit on the waiver of a constitutional right is that it must be made voluntarily, knowingly, and intelligently. *State v. Djerf,* 191 Ariz. 583, 591, 959 P.2d 1274, 1282 ¶ 21 (1998); *Long v. Arizona Bd. of Pardons and Parole,* 180 Ariz. 490, 494, 885 P.2d 178, 182 (1994). This requirement strengthens the system's integrity by protecting the due process entitlement of the accused. *See State v. Cornell,* 179 Ariz. 314, 322, 878 P.2d 1352, 1360 (1994) (stating that the rights protected by the Sixth and Fourteenth Amendments to the United States Constitution "create[ ] a delicate balance between the defendant's right to counsel and the right to proceed in propria persona.").

¶ 57 We have previously upheld a defendant's right to waive the presentation of mitigation evidence. *State v. Kayer,* 194 Ariz. 423, 984 P.2d 31 (1999); *State v. Roscoe,* 184 Ariz. 484, 910 P.2d 635 (1996). This case, however, is different. In *Kayer,* the defendant refused to cooperate with the mitigation specialist concerning psychological evidence she wanted to explore. 194 Ariz. at 434–36, 984 P.2d at 42–44, ¶ ¶ 37–42. The judge and defense counsel believed that the defendant was competent to make this decision. However, the defendant did not concede defeat and stressed to the trial judge that he wanted the mitigation specialist and his attorneys to advocate on his behalf at the mitigation hearing. The defense presented seven mitigating circumstances at that hearing.

¶ 58 By contrast, in this case, Bocharski essentially gave up. He terminated mitigation efforts and asked to be sentenced immediately without counsel. It is not clear that the defendant was competent to make such a decision; his attorneys argued that the desire to cancel the mitigation hearing reflected his mental illness and that the court "shouldn't be in the position of relying on what he has to say about that." Counsel also questioned Bocharski's understanding of the purpose of the witnesses' testimony. Controverting the defendant's idea that additional testimony would have no effect, one of his attorneys explained that there is "a whole other part of his life that he probably doesn't even understand or appreciate, and so there is a difference. Even if he wants to waive them, I wouldn't waive them." Nevertheless, the trial judge accepted the defendant's waiver. Because of this, the mitigation specialist and several other important witnesses did not testify.

¶ 59 In *Roscoe,* we upheld the defendant's right not to present mitigation evidence. *Roscoe* raised the issues of ineffective assistance and invalid waiver of counsel based upon the granting of his motion to proceed pro se and his decision not to present certain mitigation evidence. 184 Ariz. at 499, 910 P.2d at 650. We stated that an attorney can properly be influenced by his client's wishes and "[d]eference is especially appropriate . . . where the client's request involves a strong

privacy interest." *Id.* The burden of proffering mitigation evidence is on the defendant and "reinforces the conclusion that his personal decision not to present certain mitigating evidence is within his discretion." *Id.*

¶ 60 The present case is clearly distinguishable. Here, Bocharski did not forego further mitigation solely for privacy reasons; instead, he made a decision, against the strong advice of his lawyers, based in large part on his growing frustration with the court system and poor jail conditions. The trial court acknowledged the probable existence of further mitigation evidence which may have made a difference in sentencing. Indeed, Mary Durand, who did not testify at the sentencing hearing, had previously told the judge that there were other witnesses she wanted to interview and bring before the court, including the defendant's mother, foster parents, wife, uncle, brother, and the pedophile truck driver to whom the defendant was sold as a child. But the court never heard from these witnesses, at least in part because Yavapai County denied funds for transportation and preparation. These witnesses allegedly would have testified about the family's history of alcoholism and mental illness, among other things.

¶ 61 We are not comfortable with the record in this case. So long as the law permits capital sentencing, Arizona's justice system must provide adequate resources to enable indigents to defend themselves in a reasonable way. *See* Ariz.Rev.Stat. § 13–4013(B) (1989) (requiring counties to pay for experts and investigators in capital proceedings upon a showing that it is reasonably necessary to provide an indigent's defense); *State v. Cornell,* 179 Ariz. 314, 320–21, 878 P.2d 1352, 1358–59 (1994) (stating that "the trial court had both a constitutional and statutory duty to provide [the indigent] with certain essential tools of trial defense"). The process must be orderly and fair. We do not expect mitigation funds to be unlimited,[5] nor is there a set amount that will suffice. The unique facts of each case will determine what is "reasonably necessary" for an indigent to

adequately present a defense. *See* Ariz.Rev. Stat. § 13–4013(B).

¶ 62 Here, funding problems interfered with the fair and orderly administration of justice. *See State v. Eastlack,* 180 Ariz. 243, 263, 883 P.2d 999, 1019 (1994)(finding that the trial court abused its discretion by failing to provide funding for a psychological expert who was to testify at a capital sentencing hearing); *see also Bright v. State,* 265 Ga. 265, 455 S.E.2d 37, 50 (1995) (finding harmful error for failure to grant funds to hire a psychiatrist and toxicologist); *Williams v. State,* 669 N.E.2d 1372, 1384 (Ind.1996) (finding an abuse of discretion for limiting the mitigation expert to twenty-five hours of investigation). Accordingly, we must reverse and remand for resentencing.

## B.   VICTIM IMPACT EVIDENCE

¶ 63 The trial court must weigh all aggravating and mitigating circumstances in passing sentence. Ariz.Rev.Stat. § 13–703(E). While the judge may consider any mitigating evidence offered by the defendant, Ariz.Rev.Stat. § 13–703(G), he or she must take into account only *statutorily* enumerated aggravating circumstances in determining the penalty. Ariz.Rev.Stat. § 13–703(F). Thus, victim impact evidence may not be considered in aggravation, and may only be used to rebut mitigating evidence. *State v. Clabourne,* 194 Ariz. 379, 389–90, 983 P.2d 748, 758–59, ¶ 53 (1999); *State v. Roscoe,* 184 Ariz. 484, 502, 910 P.2d 635, 653 (1996).

¶ 64 Sentencing recommendations offered by a deceased's survivors have no relevance in a capital case. *Roscoe,* 184 Ariz. at 502, 910 P.2d at 653. Here, the judge identified in his special verdict those items he considered in imposing the death penalty. They include the presentence report, the attorneys' memoranda, testimony of the doctor who performed the autopsy, and the statements of those testifying on defendant's behalf. Moreover, the judge stated, "I've also considered the testimony of the daughter of the victim in this case." She had testified to

---

5.   As we have recognized previously, "an indigent defendant does not have an unlimited right to all items that he believes are necessary for his de-

fense." *Cornell,* 179 Ariz. at 320–21, 878 P.2d at 1358–59.

the impact of this crime on herself and the community, as well as the lack of remorse expressed by the defendant. She specifically recommended that Bocharski be given the death penalty. Although we normally presume that the trial judge has focused only on relevant sentencing factors,[6] his statement raises unnecessary questions about the extent to which he may have considered the daughter's testimony in this case.

¶ 65 Crime victims and/or their families have the constitutional right to be heard at sentencing. Ariz. Const. art. I, § 2.1(A)(4). As indicated above, however, the sentencing recommendation of a victim's family member is not relevant in a capital case. Thus, the trial judge must be vigilant to ensure that such testimony, once received, is not improperly considered in the sentencing equation. The instant special verdict is not helpful in this regard.

¶ 66 In addition, the judge did not state whether his consideration of the presentence report excluded a letter from Quartzsite residents who knew the victim and requested that the death penalty be imposed. Although "[p]re-sentence reports are not *per se* inadmissible in capital sentencing," a judge must not consider any portion of the report that would otherwise be excluded. *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995). Again, questions have been raised here by the trial judge's specific reference to the presentence report without mentioning that he disregarded any irrelevant content.

¶ 67 In any event, we are remanding for new sentencing on other grounds. We simply caution that whenever a trial court explicitly states that it is taking a presentence report or victim impact statement into consideration, it should point out what portions are being considered and which, if any, are being ignored.

## DISPOSITION

¶ 68 We affirm the defendant's convictions. We set aside his sentences and remand for proceedings not inconsistent with this opinion. The defendant has raised additional claims of error, all related to sentencing, "in order to avoid future claims of procedural default and to preserve [them] for further review." We need not address them in view of our decision to remand for resentencing.

CONCURRING: CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice.

MARTONE, Justice, concurring in the judgment.

¶ 69 I join the court in affirming the convictions and remanding for a new sentencing hearing. I write separately to express my disapproval of parts of the opinion.

### I. Photographs

¶ 70 Bocharski conceded the relevance of all the admitted photographs. Appellant's Opening Br. at 27. The question then is simply whether the trial court abused its discretion in weighing probative value against prejudicial effect under Rule 403, Ariz. R. Evid. As evidenced by the majority's sua sponte speculation here, appellate courts are not in a very good position to second guess such judgments. There has been no showing in this case that the trial court abused its discretion in admitting these photographs. Bocharski points to no particular photograph and no particular conduct by the trial court. Murder is a grisly business and is likely to involve grisly photographs. Absent egregious error, we should not disturb Rule 403 weighing by the trial judge. *State v. Walden*, 183 Ariz. 595, 610, 905 P.2d 974, 989 (1995); *State v. Miller*, 186 Ariz. 314, 323, 921 P.2d 1151, 1160 (1996). There was no appeal to emotion, sympathy, or horror here. *State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993).

¶ 71 One's view on the exclusion of otherwise relevant evidence is influenced by one's view of the jury system. I do not believe that jurors need to be protected from themselves. In my experience, jurors quite prop-

---

6. "Absent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and the emotional factors." *State v. Beaty*, 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988).

erly separate the wheat from the chaff. Indeed, the majority went so far in *Logerquist v. McVey*, 196 Ariz. 470, 1 P.3d 113 (2000), to allow jurors to make threshold questions about the validity of scientific assertions. While I do not go that far, *see id.* at 493, 1 P.3d at 136 (Martone, J., dissenting), I do not believe that we should be paternalistic with our jurors. The trial court did not err in admitting any of the photographs.

## II. Stipulated Testimony

¶ 72 The majority concludes that Bocharski's statement "if it were up to me, you would be dead right now," had no relevance and therefore it was error to admit it. *Ante,* ¶¶ 36–39. The test for relevance under Rule 401, Ariz. R. Evid., is "any tendency" to prove or disprove a fact. This evidence plainly meets that test. Bocharski was angry at Fields because he was a "snitch." Bocharski told Fields that he was in jail because of a "snitch" like him. It was Fields' status as a "snitch" that caused Bocharski to express a desire to kill him. In so doing, Bocharski acknowledged his own guilt. But for another "snitch," he would not have been in jail. Thus, the stipulated testimony read as a whole and in context indeed was relevant and it was not error to admit it.

## III. Victim Impact Evidence

¶ 73 The special verdict in this case is absolutely silent about victim impact evidence. *See* Spec. Verdict, July 29, 1997. Bocharski's brief spends one and one-half pages on it. I thus do not understand the majority's treatment of this non-issue. Under A.R.S. §§ 13–703(C) and (D), victim impact evidence is admissible in a capital case. Section 13–703(C) states that "[t]he victim has the right to be present and to testify at the hearing. The victim may present information about the murdered person and the impact of the murder on the victim and other family members." Subsection (D) specifically says "[i]n evaluating the mitigating circumstances, the court *shall* consider any information presented by the victim regarding the murdered person and the impact of the murder on the victim and other family members." (emphasis added). Finally, the statute

instructs that "[t]he court shall not consider any recommendation made by the victim regarding the sentence to be imposed." *Id.* Without any indication that the judge relied on the victim's sentencing recommendation, there was simply no error below and thus no occasion to dwell on this issue.

McGREGOR, specially concurring.

¶ 74 I join the majority opinion, with the exception of the majority's conclusion that the trial judge erred in admitting into evidence Exhibits 46 and 47. *Supra,* at ¶¶ 25–27. On that question, I agree with Justice Martone's conclusion that the trial judge did not abuse his discretion in admitting the challenged photographs. *Supra,* at ¶¶ 70–71.