48 P.3d 505

**Dale F. WEBB, M.D., Plaintiff–Appellant,**

**v.**

**The STATE of Arizona, by the ARIZONA BOARD OF MEDICAL EXAMINERS, an Administrative Agency of the State of Arizona, Defendant–Appellee.**

No. 1 CA–CV 01–0010.

Court of Appeals of Arizona, Division 1, Department B.

June 25, 2002.

As Corrected Aug. 15, 2002.

Bradford Law Offices, P.L.L.C. By Michael E. Bradford, Jeffrey L. Bradford, Phoenix, Attorneys for Plaintiff–Appellant.

Janet Napolitano, Attorney General By Roberto Pulver, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

FIDEL, Judge.

¶ 1 The Arizona Board of Medical Examiners, after investigating a patient's complaint against appellant Dr. Dale F. Webb, granted Webb an interview, at the conclusion of which it publicly censured him for unprofessional conduct. Webb requested rehearing, which the Board denied, and he then sought judicial review. The superior court dismissed Webb's complaint for failure to exhaust administrative remedies, but this court reversed that judgment and remanded for further proceedings. *Webb v. State ex rel. Arizona Bd. of Medical Exam'rs*, 194 Ariz. 117, 122, ¶ 27, 977 P.2d 839, 844 (App.1999). On remand, the superior court affirmed Webb's censure on the merits. In this second appeal, we reverse once more, finding that the Board failed to provide due process of law.

### I. Background

¶ 2 Webb is certified to perform both general and thoracic surgery. A patient filed a complaint with the Board in September 1994, the gist of which was that Webb had failed to take proper diagnostic measures when treating her in February 1994 for a condition that the Scripps Clinic three months later diagnosed as cancer. She also alleged that Webb's office had refused to provide her copies of her medical records.

¶ 3 The Board is statutorily charged with "[i]nitiating investigations and determining on its own motion if a doctor of medicine has engaged in unprofessional conduct or provided incompetent medical care." A.R.S. § 32–1403(A)(2) (Supp.2001). It sent Webb a copy of the patient's complaint and requested his narrative statement. Webb replied, summarized his care and treatment of the patient, and submitted copies of her medical records for release to her.[1]

¶ 4 The Board's medical consultant, Dr. Philip Z. Saba, investigated and reviewed the patient's complaint, Webb's response, and medical records from both Webb's office and the Scripps Clinic. In a written summary of his investigation, Saba reported that Webb had seen the patient on five occasions in February 1994 for a painful left groin, had diagnosed her condition as an "abscessed lymph node," had treated the patient by aspirating the abscess and prescribing antibiotics and other medications, but had failed to send a specimen for examination or culture. In May of the same year, the patient was diagnosed at the Scripps Clinic as having anal cancer that had metastasized to the lymph nodes. Saba ended his report with the conclusion that "Doctor Webb should have been more aggressive in pursuing a diagnosis."

¶ 5 The Board notified Webb by letter that an "informal interview" would be held on April 18, 1996, to discuss his care and treatment of the patient and her complaint of inappropriate management. The letter purported to include a copy of Dr. Saba's report to assist Webb's preparations; it advised Webb of his right to be represented by counsel and his right to either submit material in advance or bring material to the interview that he wished the Board to consider; and it advised him that, after a brief overview by the Board's consultant (Dr. Saba), Webb would be asked to present "a concise, factual oral response" to the issues addressed in Saba's report. The letter advised that after the interview, the Board could "continue the investigation, file the matter for information, dismiss the matter, file the matter with an advisory Letter of Concern, take disciplinary action, or refer the matter to a formal hearing for possible revocation of license." The letter did not advise Webb that he had an option to decline an interview and choose a full, formal hearing instead.

¶ 6 Webb appeared without counsel at the time scheduled for his interview, which proceeded as we will describe below. At its conclusion, the Board unanimously approved Findings of Fact, Conclusions of Law, and a Decree of Censure. The Board found that Webb had engaged in "unprofessional conduct" that fell within A.R.S. § 32–1401(25), subparts (q) and (ll). "Unprofessional conduct" is defined at length in A.R.S. § 32–1401(25) (1996). Subpart (q) includes within the definition "[a]ny conduct or practice that is or might be harmful or dangerous to the health of the patient or the public"; subpart (ll) includes "[c]onduct that the board determines is gross negligence, repeated negligence or negligence resulting in harm to or the death of a patient."

## II. STANDARD OF REVIEW

¶ 7 In reviewing an administrative agency's decision, the superior court examines whether the administrative action was illegal, arbitrary, or capricious, and whether it involved an abuse of discretion. A.R.S. §§ 12–901 to 913 (1992); *Ethridge v. Arizona State Bd. of Nursing*, 165 Ariz. 97, 100, 796 P.2d 899, 902 (App.1989). In our review of the superior court's ruling upholding the administrative decision, we independently examine the record to determine whether the evidence supports the judgment. *Carley v. Arizona Bd. of Regents*, 153 Ariz. 461, 463, 737 P.2d 1099, 1101 (App.1987). Neither this court nor the superior court may substitute its judgment for that of the agency on factual questions or matters of agency expertise. *DeGroot v. Arizona Racing Comm'n*, 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984). We apply our independent judgment, however, to questions of law, including questions of statutory interpretation and constitutional claims. *Hansson v. State Bd. of Den-*

---

1. The records were released to the patient. Because the Board made no findings regarding an initial failure to release records, we conclude that this allegation was not a basis for the censure.

*tal Exam'rs,* 195 Ariz. 66, 68, ¶ 6, 985 P.2d 551, 553 (App.1998).

## III. PROCEDURAL DUE PROCESS

■ ¶ 8 A physician has a property interest in a license to practice medicine, and the State may not deprive a physician of that interest without due process of law. *Comeau v. Arizona State Bd. of Dental Exam'rs,* 196 Ariz. 102, 106, ¶ 18, 993 P.2d 1066, 1070 (App.1999). Professional censure "is a form of deprivation." *Id.; see also* A.R.S. § 32–1451(G)(4) (1996) ("[C]ensure is an official action against the doctor's license.").

■ ¶ 9 Procedural due process requires notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *Comeau,* 196 Ariz. at 106–07, ¶ 20, 993 P.2d. at 1070–71. Webb claims that he was denied a meaningful opportunity to be heard at the interview conducted by the Board. In response, the Board defends the procedural adequacy of Webb's interview but also argues that Webb waived a more formal hearing by choosing to appear for an interview instead.

■ ¶ 10 Considering the latter point first, we find no waiver of due process requirements. A valid waiver of constitutional rights must be voluntary, knowing, and intelligent. *State v. Bocharski,* 200 Ariz. 50, 61, ¶ 56, 22 P.3d 43, 54 (2001); *Lynch v. Lynch,* 164 Ariz. 127, 132, 791 P.2d 653, 658 (App. 1990) (waiver requires one to intentionally relinquish a known right); *A.J. Bayless Markets v. Indus. Comm'n,* 134 Ariz. 243, 245, 655 P.2d 363, 365 (App.1982) (to waive fundamental right to cross-examine requires clear showing of intent). No such waiver may be found in the record of this case. Not only did Webb not waive his entitlement to due process of law; neither can he be found to have made a knowing choice between an interview and a hearing.

¶ 11 When the Board requested in writing that Webb appear for an "informal interview," it did not state that he had the option to decline or that he could choose a formal hearing instead. The thrust of the letter was that Webb was expected to appear.[2] Even the statute does not suggest an unconstrained choice between an interview and a formal hearing. The statute then in force provided that a formal hearing would be ordered if a physician "refuses the invitation" to attend an informal interview. *See* A.R.S. § 32–1451(G) (1996). A physician facing potentially severe disciplinary sanctions from the tribunal extending such an invitation would understandably be hesitant to refuse.

¶ 12 We do not suggest that due process cannot be satisfied through a process that includes elements of an interview. "Due process is not necessarily judicial process." *Rosenberg v. Arizona Bd. of Regents,* 118 Ariz. 489, 492, 578 P.2d 168, 171 (1978). Nor does it entail one set "of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The Medical Practice Act, however, permits the Board, at the conclusion of an interview and *without* convening a formal hearing, to file a letter of concern, file a letter of reprimand, issue a decree of censure, fix a period and terms of probation, restrict the doctor's license to practice, require restitution of fees, or temporarily suspend the right to practice for up to 12 months. *See* A.R.S. § 32–1451(G). A person facing such a range of consequences, in our judgment, must at a minimum be provided a chance to confront adverse evidence and question adverse witnesses. *See App. of Levine,* 97 Ariz. 88, 91, 397 P.2d 205, 207 (1964) (a deprivation hearing, to satisfy due process, must include among other elements notice, a reasonably definite statement of charges, and the right to produce witnesses and examine adverse witnesses); *see also Goldberg v. Kelly,* 397

---

**2.** Under A.R.S. § 32–1451(G) (1996), the statute in effect at the time of these proceedings, the hearing provided to Webb was described as an "Informal Interview." The Board's notice to Webb pointed out, however, that although the procedure was "called an Informal Interview in the Medical Practice Act, many physicians do not regard the interview as 'informal.'" By recent amendment the process is now more aptly described as a "formal interview." *See* A.R.S. § 32–1451(I) (2001).

U.S. 254, 268, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Carroll v. Robinson,* 178 Ariz. 453, 461, 874 P.2d 1010, 1018 (App.1994).

¶ 13 Webb contends that the Board denied him due process by (1) not allowing him to cross-examine Saba; (2) preventing him from addressing Saba's critique and the Board's concerns and from submitting evidence in his own behalf; and (3) failing to give him copies of Saba's report or the Scripps Clinic medical records, which were considered by Saba and the Board. We may quickly dispose of the last point. The Board does not dispute that Webb was entitled to a copy of Saba's report, but the record does not substantiate Webb's claim that the Board failed to give him one. As we have already noted, the Board stated in its letter notifying Webb of the date of his interview that it was enclosing Saba's report, and Webb did not object at the time of the hearing that he had not received it. As for the Scripps Clinic documents, the record neither establishes that Webb was offered or requested an opportunity to review them nor establishes that such an opportunity was denied him. Because we are remanding on other grounds, it suffices to state that Webb will be entitled to review those documents on remand. *See Deuel v. Arizona St. Sch. for the Deaf and Blind,* 165 Ariz. 524, 527, 799 P.2d 865, 868 (App.1990) (citing *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

■ ¶ 14 More consequential is Webb's argument that the Board failed to give him the opportunity to question Saba, the Board's investigator and chief witness against him. The Board's answering brief appropriately assumes that Webb was entitled to this right. It states that the Board "allows the parties to present testimony, [and] to examine or cross-examine witnesses." Nothing in the Board's letter to Webb, however, informed him of a right to cross-examine Saba or, indeed, anyone else. The letter advised that, following Saba's presentation, Webb would "be required to discuss the case and answer ques-

tions," that he "must be brief and to-the-point," and that the Board "will ask you questions for the remainder of the interview." If he chose to bring an attorney, "the attorney may comment briefly or *ask questions of the Board.*" (Emphasis added.) The letter did not say that an attorney could question the Board's consultant, nor did it say that Webb, if unrepresented, could question anyone.

¶ 15 At the interview, Webb was never asked if he had questions for Saba; nor, indeed, was he asked until after the outcome was decided whether he had any questions for the Board. The interview began with Saba's report. At the conclusion of his presentation—a logical moment to offer Webb the opportunity to question Saba—the Board did not do so. Although Webb asked immediately to respond to Saba, Chairman Richard D. Zonis replied that Webb would have "plenty of opportunity" to do so later. Dr. Philip E. Keen, the Board's Vice Chair, then asked Webb a series of questions, after which he stated, "Now, ... have I given you a chance to respond to the area w[h]ere you wished to respond initially?"

¶ 16 During the discussion that followed, Webb did manage to address Saba's critique, defend his treatment decisions, and summarize his evolving diagnostic impressions.[3] Thus, although Webb lacked the opportunity to question Saba, we disagree that the Board denied him *any* opportunity to respond to Saba's criticism or the Board's concerns. Even this opportunity, however, was significantly curtailed. At the conclusion of the hearing, after informing Webb of the censure, Chairman Zonis stated, "That is on your record forever." Then for the first time, Webb was asked if he had any questions. Webb attempted to formulate a question: "You're saying it was damaging to the patient. In what manner would it have altered...." But Chairman Zonis cut him off,

---

3. For instance, Webb stated that cancer had not entered his mind while treating the patient. Responding to the charge of being insufficiently aggressive, he stated, "contrary to what I've been accused of, ... that two weeks is not being aggressive, I sit ... for two or three weeks, a

month, on a breast lesion that I'm highly suspicious is malignant." He stated that he did not believe it would have been "good medicine to haul this patient into surgery and excise this lymph node" when it appeared so infected.

stating, "Well, we can't go into those details at this point, doctor."

¶ 17 In summary, Webb attended a proceeding that resulted in a public censure and that could have resulted in a sanction as severe as a suspension from practice for as much as a year. At such a proceeding, the Board is obliged to provide, and professes to provide, an opportunity to question adverse witnesses. Webb, however, was given no such opportunity. Accordingly, because he was denied the right to fully and fairly test the evidence against him before the Board imposed a permanent and public sanction, we set aside the sanction and direct that he be granted a new hearing that satisfies the requirements of due process.

### IV. A.R.S. § 32–1401(25)(ll)

■ ¶ 18 Although for reasons already addressed, we must remand this matter, in order to provide guidance upon remand we will address two further issues that are likely to recur. The first concerns the burden upon the Board if it undertakes once more to establish that Webb violated A.R.S. § 32–1401(25)(ll) by committing either gross negligence, repeated negligence, or negligence that caused the patient harm or death.

■ ¶ 19 At the underlying interview, Board members Zonis and Keen and Board consultant Saba identified mistakes that they felt Webb had made and rendered opinions about what they thought he should have done, but they did not articulate a standard of requisite professional care under the circumstances and in the relevant community. "[A] doctor is not liable in negligence for mere mistakes in judgment in treating a patient, but is only liable where the treatment falls below the recognized standard of good medical practice." *Croft v. State Bd. of Dental Exam'rs,* 157 Ariz. 203, 209, 755 P.2d 1191, 1197 (App.1988) (citing *Kalar v. Mac-Collum,* 17 Ariz.App. 176, 178, 496 P.2d 602, 604 (1972)).

■ ¶ 20 Although the Board may establish the standard of professional care based upon its members' experience and expertise, the Board "cannot base its findings … upon either undisclosed evidence or personal knowledge of the facts." *Croft,* 157 Ariz. at 209, 755 P.2d at 1197 (quoting *Davidson v. State,* 33 Wash.App. 783, 657 P.2d 810, 812 (1983)). Nor in our judgment can the Board provide a fair hearing on an issue of negligence without identifying the standard of care and articulating the alleged deviation. Not only must the Board identify the standard and articulate the alleged deviation in order to provide the physician under investigation a fair opportunity to respond to a charge of negligence; it must do so in order to provide a reviewing court an opportunity for meaningful review. "Without clearly articulated standards as a backdrop against which the court can review discipline, the judicial function is reduced to serving as a rubber-stamp for the Board's action." *Woodfield v. Bd. of Prof'l Discipline of State Bd. of Med.,* 127 Idaho 738, 905 P.2d 1047, 1057 (App.1995).[4]

¶ 21 Additionally, in contrast to subsection 32–1401(25)(q), which requires only potential harm to a patient or the public, subsection 32–1401(25)(ll) requires actual harm. During the course of Webb's interview, the Board made no effort to prove that his treatment resulted in actual harm to his patient—i.e., that a more aggressive diagnostic effort would have made a difference. Indeed, when Webb, after being told that he was censured, attempted to ask how his treatment had damaged the patient and how a more aggressive intervention would have altered her prognosis, Chairman Zonis cut him off in mid-question and declined "to go into those details." *See supra* ¶ 16.

¶ 22 In summary, if the Board undertakes to establish upon remand that Webb's conduct was negligent and thus unprofessional under A.R.S. § 32–1401(25)(11), it must establish a deviation from an articulated standard of professional care, establish that the deviation resulted in actual harm, and provide reviewable findings on both points.

---

**4.** Articulating the standard of care for an errant physician is likewise necessary to accomplish the

rehabilitative purpose of discipline.

## V. POTENTIAL HARM

¶ 23 In contrast, in order to establish that Webb violated A.R.S. § 32–1401(25)(q), the Board need only prove that his conduct was "*or might be* harmful or dangerous to the health of the patient or the public." (Emphasis added.) This standard is broad enough to encompass a diagnostic failure and treatment delay that significantly reduces a patient's chance of a better outcome. Our courts have recognized that loss of a chance may be a basis for liability in some negligence cases. *See Thompson v. Sun City Comm. Hosp., Inc.*, 141 Ariz. 597, 606, 688 P.2d 605, 614 (1984) (whether hospital's failure to promptly operate deprived plaintiff of "some significant chance of survival or better recovery" was question for jury); *see also Lohse v. Faultner,* 176 Ariz. 253, 261–63, 860 P.2d 1306, 1314–16 (App.1992) (addressing question whether defendants' failure to conduct proper fire patrol caused loss of a substantial chance to avoid property loss from fire). The Board may attempt to establish potential harm of this nature upon remand.

¶ 24 Webb contends, however, that the words "Any conduct or practice that is or might be harmful or dangerous to the health of the patient or public" are unconstitutionally vague—so vague or overly inclusive that a physician who came to work with a head cold could be found to violate the statute.

¶ 25 We acknowledge that the words "is or might be harmful or dangerous" are broad. Many appropriate forms of medical treatment entail potential harm. There is some potential for harm in most prescriptive medication; and some forms of treatment—radiation and chemotherapy, to name two—involve near certainty of harm, yet harm accepted and acceptable in the effort to alleviate still greater harm.

¶ 26 That statutory language is potentially overly inclusive does not mean, however, that it is unconstitutional. "[A] statute need not be drafted with absolute precision. 'Condemned to the use of words, we can never expect mathematical certainty from our language.'" *State v. Baldwin,* 184 Ariz. 267, 270, 908 P.2d 483, 486 (App.1995) (citation omitted) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Before a court concludes that a statute is unconstitutionally vague, the court should consider whether a narrowing construction would clarify the meaning of the statute without unreasonably constricting the legislative intent. *Id.* Such a construction is readily available in this case.

¶ 27 The legislature could not have intended in adopting the "might be harmful or dangerous" standard of A.R.S. § 32–1401(25)(q) to categorize as unprofessional, and permit the Board to sanction, any form of treatment that entails potential danger or harm. Surely the legislature intended rather to proscribe only those forms of treatment whose potential or actual harm is *unreasonable* under the circumstances, given the applicable standard of care. Finding such a qualification implicit in any sensible reading of the statute, we reject the argument that the statute is unconstitutionally vague. The Board may thus consider, if it chooses to do so upon remand, whether Webb's conduct was in violation of A.R.S. § 32–1401(25)(q), so interpreted and defined.

## VI. CONCLUSION

¶ 28 We reverse the trial court's judgment, set aside the Board's decision, and remand to the Board for further proceedings in accord with this opinion. Webb's request for attorney's fees on appeal pursuant to A.R.S. § 12–348(A)(2) (1992) is denied, as a fee award pursuant to that statute is limited to a party who has prevailed by an adjudication on the merits. *See Columbia Parcar Corp. v. Ariz. Dep't of Transp.,* 193 Ariz. 181, 183, 971 P.2d 1042, 1044 (App.1999).

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge and JOHN C. GEMMILL, Judge.