176 P.3d 703

Deborah S. GOLOB, M.D., Plaintiff/Appellant,

v.

ARIZONA MEDICAL BOARD OF THE STATE of Arizona; Timothy C. Miller, J.D., Executive Director, Arizona Medical Board, Defendants/Appellees.

No. 1 CA–CV 07–0006.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 5, 2008.

Hendrickson & Palmer, P.C., By Adam P. Palmer, Phoenix, Attorneys for Plaintiff/Appellant.

Terry Goddard, Attorney General, By Anne W. Froedge, Assistant Attorney General, Phoenix, Attorneys for Defendants/Appellees.

## OPINION

EHRLICH, Judge.

¶ 1 Deborah S. Golob, a physician licensed by the State of Arizona, appeals the superior court's judgment upholding a Decree of Censure and other sanctions imposed on her by the Arizona Medical Board (the "Board"). The Board acted after finding that Dr. Golob had issued prescriptions over the internet without conducting a physical examination of the individual for whom the medicine was authorized or without previously establishing a physician-patient relationship. We reject Dr. Golob's challenges to the sufficiency of the evidence and to certain statutes, and we therefore affirm the judgment against her.

## FACTUAL [1] AND PROCEDURAL BACKGROUND

■ ¶ 2 Between February 24, 2004, and April 14, 2005, Dr. Golob worked for Secure Medi-cal, Inc., from a cubicle in Low Cost Pharmacy in Tempe, Arizona. This small

---

1. On appeal, we review the evidence as most favorable to upholding the decision of the administrative board. *Prebula v. Ariz. Dep't of Econ.* *Sec.,* 138 Ariz. 26, 30, 672 P.2d 978, 982 (App. 1983).

**508**

workplace near the front of the pharmacy contained a computer terminal but none of what the Board later described as any "other usual appurtenances relating to the practice of medicine."

¶ 3 In a letter dated June 30, 2004, the Arizona State Board of Pharmacy ("Pharmacy Board"), after an investigation, notified the Board that Dr. Golob was issuing prescriptions over the internet based upon online questionnaires completed by individuals desirous of those medicines. The Pharmacy Board's director opined that Dr. Golob was violating Arizona Revised Statutes ("A.R.S.") § 32–1401(27)(ss) (Supp.2006),[2] which defines "[u]nprofessional conduct" to include "[p]rescribing, dispensing or furnishing a prescription medication ... to a person unless the licensee first conducts a physical examination of that person or has previously established a doctor-patient relationship."

¶ 4 The Board's ensuing investigation confirmed that Dr. Golob had been issuing prescriptions for medicines based upon individuals' answers to internet questionnaires, supplemented on occasion by those persons' responses to additional questions asked of them by operators via the internet or the telephone. The prescriptions approved by Dr. Golob were filled by Low Cost Pharmacy. The individuals paid a charge for the questionnaire and for the medicine. Dr. Golob received a salary from Secure Medical.

¶ 5 Most of Dr. Golob's prescriptions were for erectile dysfunction; others were for pain, cold sores and contraception. Indeed, the superior court found, Dr. Golob wrote more than 9000 prescriptions between February 24, 2004, and July 2, 2004,[3] rejecting relatively very few requests during that same time. Dr. Golob performed no physical examinations; in fact, she had no face-to-face contact with any of the individuals for whom she prescribed medicine.

¶ 6 The Board Staff Investigational Review Committee determined that Dr. Golob had "committed unprofessional conduct." The Board then reviewed the evidence obtained during its investigation and conducted a formal interview of Dr. Golob on April 14, 2005. It found that the appropriate "standard of care required [Dr. Golob] to prescribe prescription only medications over the internet to patients with whom she had an appropriate physician-patient relationship" (Finding 24) and that she had "deviated from the standard of care because she prescribed prescription only medication over the internet without appropriate physician-patient relationships" (Finding 24),[4] adding that "[t]here was potential harm to the patients to whom [Dr. Golob] issued prescriptions because without the appropriate physician-patient relationship the patients may have been prescribed improper or dangerous medications" (Finding 25). The Board concluded that Dr. Golob's conduct was unprofessional as defined by A.R.S. § 32–1401(27)(q) ("Any conduct or practice that is or might be harmful or dangerous to the health of the patient or the public.") and (ss), and entered its Findings of Fact, Conclusions of Law and Order. In its Order, Dr. Golob was "issued a Decree of Censure for issuing prescriptions on the internet with[out] conducting a physical examination or having previously established a doctor-patient relationship." The Board also placed Dr. Golob on probation for five years; included as terms and conditions of that probation were the payment of a $10,000 civil penalty and the suspension of Dr. Golob's license for a period of no more than twelve months unless, within that time, she completed twenty hours of continuing medical education in medical ethics in addition to the hours required for a biennial renewal of her license.[5] Finally, the Board retained jurisdiction for the term of probation to conduct random chart reviews of Dr. Golob's records and to impose additional remedial or disci-

2. We refer to the current version of the statute, whose provisions are identical to the 2002 version save for the numbering.

3. In a superior-court pleading, Dr. Golob asserted that she had prescribed medicine through her internet practice for "tens of thousands of patients."

4. There are two separate Findings numbered "24."

5. Dr. Golob fulfilled the education requirement, and the suspension was lifted on October 6, 2005.

plinary measures if it deemed such action to be appropriate.

¶ 7 Dr. Golob's Petition for Rehearing/Alternatively Petition for Review was denied by the Board. She filed a complaint for judicial review in superior court. A.R.S. § 12–905(A) (2003). The court affirmed the Board's order, and this appeal followed.

## DISCUSSION

### A. Subject–Matter Jurisdiction

¶ 8 A threshold issue presented by Dr. Golob is whether the Board had subject-matter jurisdiction to discipline her, a question of law that we review de novo. Murphy v. Bd. of Med. Exam'rs, 190 Ariz. 441, 446 n. 8, 949 P.2d 530, 535 n. 8 (App.1997). Dr. Golob contends that subject-matter jurisdiction depends on the patient's location at the time the prescription is dispensed and that the Board lacked evidence that she wrote any prescription for a patient located in Arizona.

¶ 9 The Board may investigate whether "a doctor of medicine has engaged in unprofessional conduct or provided incompetent medical care," A.R.S. § 32–1403(A)(2) (2002), whether the unprofessional conduct "occur[s] in this state or elsewhere." A.R.S. § 32–1401(27). Dr. Golob was a doctor of medicine licensed to practice medicine[6] by the State of Arizona. She lived in Arizona, and she reviewed individuals' responses to internet questionnaires and prescribed medicine for those persons from her workspace in Arizona. These facts alone are sufficient to confer jurisdiction on the Board.

¶ 10 Additionally, at least some of the individuals for whom Dr. Golob prescribed medicine were in Arizona by her own admission. Although Dr. Golob now claims that no evidence supports the Board's finding that she reviewed the questionnaires of Arizona individuals or issued prescriptions to Arizona residents, at the Board's formal interview of her, she testified that her patients came from "all 50 states" as well as "from Europe and the Caribbean." Therefore, she must have

treated at least one patient from Arizona. The Board's lawful exercise of its jurisdiction is clear.

### B. Sufficiency of the Board's Evidence

¶ 11 Dr. Golob contends that the Board's Findings 24 and 25 lack adequate evidentiary support. In reviewing a judgment upholding an administrative agency's decision, we independently study the record to assess whether substantial evidence supports the agency's action. Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs, 202 Ariz. 555, 557 ¶ 7, 48 P.3d 505, 507 (App.2002). We do not "substitute [our] judgment for that of the agency on factual questions or matters of agency expertise." Id. Indeed, "we give great weight to an agency's interpretation of the statutes" that it is charged with implementing. Sanderson Lincoln Mercury, Inc. v. Ford Motor Co., 205 Ariz. 202, 205 ¶ 8, 68 P.3d 428, 431 (App.2003). Ultimately, we will affirm the agency's action unless we conclude that its decision "is not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12–910(E) (2003); accord Webb, 202 Ariz. at 557 ¶ 7, 48 P.3d at 507; Lathrop v. Ariz. Bd. of Chiropractic Exam'rs, 182 Ariz. 172, 177, 894 P.2d 715, 720 (App.1995).

¶ 12 The record sufficiently supports the Board's Findings 24 and 25 that Dr. Golob deviated from the requisite standard of care by prescribing medicine over the internet for individuals with whom she had not established an appropriate physician-patient relationship and that there was "potential harm" to those persons because they "may have been prescribed improper or dangerous medications." The standard of care as found and applied by the Board is embodied in A.R.S. § 32–1401:

27. "Unprofessional conduct" includes the following, whether occurring in this state or elsewhere:

infirmities ... by any means...." A.R.S. § 32–1401(22).

6. The "[p]ractice of medicine" includes "the diagnosis, the treatment or the correction of ... any and all human diseases, injuries, ailments,

\* \* \*

(q) Any conduct or practice that is or might be harmful or dangerous to the health of the patient or the public.

\* \* \*

(ss) Prescribing, dispensing or furnishing a prescription medication or a prescription-only device as defined in [A.R.S.] § 32–1901 to a person unless the licensee first conducts a physical examination of that person or has previously established a doctor-patient relationship.... [7]

¶ 13 Dr. Golob admitted that in no case did she conduct a physical examination of a person for whom she prescribed medicine. She contends that she fulfilled the alternative statutory requirement that there be a "previously established ... doctor-patient relationship" by in each case accepting a consultation fee and reviewing the individual's responses to the questionnaire, occasionally directing an operator to ask the person additional questions, before prescribing medicine.[8] This assertion has no merit.

¶ 14 We will accept for the purpose of Dr. Golob's argument her proposition that an individual's payment, apparently to Secure Medical, for a questionnaire provided over the internet constitutes "a consultation fee." Even so, Dr. Golob's review of a person's answers to a questionnaire, and her occasional direction to an operator to ask additional questions of the individual via the internet or by telephone, does not constitute the previous establishment of a physician-patient relationship with that individual within the meaning of A.R.S. § 32–1401(27)(ss). At the least,

there is no evidence that, before receiving the responses to the questionnaires, Dr. Golob had any relationship with any of these persons. Thus there was no "previously established" physician-patient relationship that would allow her to prescribe medicine to any of the individuals who answered the questionnaire.

¶ 15 The North Dakota Supreme Court has held that reviewing an internet medical questionnaire does not meet the standard of care for establishing a legitimate physician-patient relationship before dispensing prescriptions. *Jones v. N.D. State Bd. of Med. Exam'rs,* 691 N.W.2d 251, 257–58 ¶¶ 19–21 (N.D.2005). Like Dr. Golob, Dr. Jones had prescribed Viagra and other medications based upon his review of responses to internet questionnaires. The court found substantial evidence supporting the North Dakota Board's determinations of inappropriate care as well as unprofessional conduct, *id.* at 258 ¶ 21, and it remanded the case solely for the Board to explain why it had rejected an administrative law judge's proposed sanction of a censure, fine and warning in lieu of revoking the physician's medical license. *Id.* at 258–59 ¶¶ 23–25.

¶ 16 Dr. Golob relies upon cases that are readily distinguishable because they stand for the proposition that the rendering of advice by a physician can create a duty between the physician and a person in the absence of a traditional physician-patient relationship. None of these cases has any legal relevance to the issuance of prescriptions over the internet without the formation of any professional relationship. *See Stanley v. McCarver,* 208 Ariz. 219, 220 ¶ 2, 223 ¶¶ 12–

7. This subdivision has exceptions for "[a] physician who provides temporary patient supervision on behalf of the patient's regular treating" physician, for "[p]rescriptions written to prepare a patient for a medical examination," for "[e]mergency medical situations as defined in [A.R.S.] § 41–1831" and for certain uses by a county or tribal public health department. A.R.S. § 32–1401(27)(ss)(i)–(iv). None of the exceptions applies to this case.

8. Dr. Golob asserts that she did not rely only upon the responses to questionnaires but also "routinely contacted the patients via the telephone and spoke directly with the patients gathering additional background history and medical

information." Her own testimony at the formal interview contradicts this assertion:

> And after going over the extensive questionnaire, I contact all patients through our telephone operators who are also—they have a list of questions that I have written, and I ask them to ask the patients, and they go back and either on the Internet by e-mail or by telephone, and then go back to the patient and ask questions or ask to verify—I have some information that I give them, for example, and then if the patient is—appears qualified or medically qualified to receive the prescription, then I will okay it.

14, 92 P.3d 849, 850, 853 (2004) (finding that a radiologist owed a duty of care to the applicant arising out of the radiologist's evaluation for pre-employment tuberculosis screening); *see also Diggs v. Ariz. Cardiologists, Ltd.*, 198 Ariz. 198, 199 ¶¶ 3, 5, 201 ¶ 14, 203 ¶ 27, 8 P.3d 386, 387, 389, 391 (App.2000) (holding that an express contractual relationship was not necessary to find that a duty of care existed between a patient and a cardiologist who was informally consulted by the patient's emergency-room physician); *Dougherty v. Gifford*, 826 S.W.2d 668, 674–75 (Tex.App.1992) (implying a relationship between a patient and a pathologist because diagnostic services were furnished on the patient's behalf); *Walters v. Rinker*, 520 N.E.2d 468, 471–72 (Ind.Ct.App.1988) (implying a relationship between a patient and a pathologist because the patient's treating physician had requested pathology services on the patient's behalf).

¶ 17 The Board's interpretation of A.R.S. § 32–1401(27)(ss) aligns with the policy of the American Medical Association in its *Guidance for Physicians on Internet Prescribing*, H–120.949 (June 2003)("AMA *Guidance*"). It also is consistent with the policy of the Federation of State Medical Boards of the United States, Inc., as expressed in its *Model Guidelines for the Appropriate Use of the Internet in Medical Practice* (2002) ("Federation *Guidelines*").

¶ 18 Specifically, the AMA *Guidance* states:

> ... Physicians who prescribe medications via the Internet shall establish, or have established, a valid patient-physician relationship, including, but not limited to, the following components. The physician shall: (i) obtain a reliable medical history and perform a physical examination of the patient, adequate to establish the diagnosis for which the drug is being prescribed and to identify underlying conditions and/or contraindications to the treatment recommended/provided; (ii) have sufficient dialogue with the patient regarding treatment options and the risks and benefits of treatment(s); (iii) as appropriate, follow up with the patient to assess the therapeutic out-

come; (iv) maintain a contemporaneous medical record that is readily available to the patient and, subject to the patient's consent, to his or her other health care professionals; and (v) include the electronic prescription information as part of the patient medical record. Exceptions to the above criteria exist in the following specific instances: treatment provided in consultation with another physician who has an ongoing professional relationship with the patient, and who has agreed to supervise the patient's treatment, including use of any prescribed medications; and on-call or cross-coverage situations.

¶ 19 The Federation *Guidelines* provide that a "relationship is clearly established when the physician agrees to undertake diagnosis and treatment of the patient and the patient agrees, whether or not there has been a personal encounter between the physician ... and the patient." Federation *Guidelines* at 4. This is clarified by the later statement that "[t]reatment, including issuing a prescription, based solely on an online questionnaire or consultation does not constitute an acceptable standard of care." *Id.* at 5.

¶ 20 We agree with the superior court that the Board was entitled to find that, in the words of the Board, Dr. Golob "deviated from the standard of care because she prescribed prescription only medication over the internet without appropriate physician-patient relationships." We also agree with the court that the Board was entitled to find that, again in the words of the Board, "[t]here was potential harm to the patients to whom [Dr. Golob] issued prescriptions because without the appropriate physician-patient relationship the patients may have been prescribed improper or dangerous medications."

¶ 21 Dr. Golob freely prescribed medications for erectile dysfunction, pain, cold sores and contraception. In the case of S.F.,[9] Dr. Golob prescribed Tramadol based upon the man's complaints of pain in the knee and lower leg as set forth in his responses to the internet questionnaire. S.F.

---

9. We use the man's initials to protect his privacy.

listed no primary-care physician, and told Dr. Golob through an intermediary that he had seen a physician but had never been prescribed Tramadol. In her formal interview, Dr. Golob admitted that the standard of care required that she physically examine S.F. to make sure that he was not suffering from septic arthritis or a more severe condition. She also recognized that a physical examination of a person complaining of leg pain can alert the physician to how the individual walks and any pulses, perfusion and/or signs of joint inflammation. This evidence alone supports the charge that Dr. Golob deviated from the standard of care and created a potential harm to S.F. in dispensing prescription medicine to him.

¶ 22 Dr. Golob also prescribed contraceptive medication based solely upon a woman's representations that the woman had undergone a pelvic examination and had a Pap smear in the year for which Dr. Golob was prescribing the medicine. Again, Dr. Golob conceded the importance of conducting physical examinations before prescribing such medication.

¶ 23 In addition, Dr. Golob did not personally examine men for whom she prescribed medication for erectile dysfunction, instead asking whether the individual had seen a physician in the previous two years. She recognized, though, that erectile dysfunction could involve an enlarged prostate and early prostate cancer or testicular carcinoma.

¶ 24 With respect to prescriptions that she wrote for cold sores, the Board questioned how Dr. Golob could rely upon the individual to differentiate between herpetic eruptions and squamous-cell carcinoma. Dr. Golob countered that such a person would know of his or her personal history of cold sores, but she conceded that this was "not a hard and fast rule, of course."

¶ 25 More generally, Dr. Golob acknowledged that she had no choice but to accept an individual's responses to the questionnaire and that, when she recommended that a person consult a physician if there was a possible medical issue, she had no way to assure herself that the individual followed through. Instead, she had "to take them on face value." Dr. Golob further accepted that it is not a common practice for a physician to rely upon a person's description of a physical examination performed on the individual by another physician and the results of any such examination before prescribing prescription medicine. While Dr. Golob claimed to have consulted the physicians of some individuals who suggested that they may have more serious problems, including diabetes, she also conceded that such was "not the usual thing."

■ ¶ 26 This evidence substantially supports the Board's findings that Dr. Golob engaged in unprofessional conduct. She herself described deficiencies in her medical practice, and the Board was entitled to use its members' expertise to determine that Dr. Golob's conduct deviated from the standard of care and could be harmful to the individuals for whom she was prescribing medicine over the internet. *See Lathrop*, 182 Ariz. at 181, 894 P.2d at 724; *see also Croft v. Ariz. State Bd. of Dental Exam'rs*, 157 Ariz. 203, 209, 755 P.2d 1191, 1197 (App.1988).

*C. Constitutionality of A.R.S. § 32–1401(27)(q) and (ss)*

■ ¶ 27 Dr. Golob insists that the phrases "[a]ny conduct or practice that is or might be harmful or dangerous to the health of the patient or the public" in A.R.S. § 32–1401(27)(q) and "previously established a doctor-patient relationship" in A.R.S. § 32–1401(27)(ss) are impermissibly vague and, therefore, the statutes violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. We review this issue *de novo*, *Shaffer v. Ariz. State Liquor Bd.*, 197 Ariz. 405, 408 ¶ 8, 4 P.3d 460, 463 (App.2000), beginning with the presumption that the statute is constitutional. *State v. Singer*, 190 Ariz. 48, 50, 945 P.2d 359, 361 (App.1997).

■ ¶ 28 A statute "fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (citation omitted).

It is a basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (footnote omitted).

¶ 29 Although neither the phrase "[a]ny conduct or practice that is or might be harmful or dangerous to the health of the patient or the public" nor the phrase "previously established a doctor-patient relationship" is defined in A.R.S. § 32–1401(27), the Legislature "need not define statutory terms with linguistic precision in order to withstand a vagueness challenge," *Brighton Pharmacy, Inc. v. Colorado State Pharmacy Board,* 160 P.3d 412, 420 (Colo.Ct.App.2007), nor need it describe every possible boundary of the statute's application as long as the statute provides "fair notice of what is to be avoided or punished." *Fuenning v. Superior Ct.,* 139 Ariz. 590, 598, 680 P.2d 121, 129 (1983), *superseded by statute on other grounds,* A.R.S. § 28–695(B) (1984). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. A statute will not run afoul of the Due Process Clause simply because a member of the public may not be able to readily determine how far she can go before she violates the law. *Fuenning,* 139 Ariz. at 598, 680 P.2d at 129.

¶ 30 This case parallels *Brighton Pharmacy,* 160 P.3d 412, in which a pharmacy and a pharmacist challenged the Colorado State Board of Pharmacy's adoption of the following rule:

A pharmacist shall make every reasonable effort to ensure that any order, regardless of the means of transmission, has been issued for a legitimate medical purpose by an authorized practitioner. A pharmacist shall not dispense a prescription drug if the pharmacist knows or should have known that the order for such drug was issued on the basis of an internet-based questionnaire, an internet-based consultation, ... all without a valid preexisting patient-practitioner relationship.

*Id.* at 414–15. One of their arguments was that the phrase "valid preexisting patient-practitioner relationship" was impermissibly vague and overbroad. *Id.* at 419.

¶ 31 The Colorado Court of Appeals disagreed, explaining that the rule pertained to "the regulation of trained professionals" expected to be knowledgeable about their profession and the context of the rule. *Id.* It held that the phrase could withstand scrutiny even if the rule failed to "define statutory terms with linguistic precision" and did not "specify every conceivable boundary of its application." *Id.* at 420. Noting that administrative-hearing and judicial-review procedures were effective protections from the unbridled exercise of administrative discretion of which the Board of Pharmacy had been accused, the court concluded that, "even if the phrase 'valid preexisting patient-practitioner relationship' [was] not a term of general use, it [was] used by practitioners in the health care industry and should be well within the knowledge of a Colorado licensed pharmacist." *Id.*

¶ 32 The court's analysis in *Brighton* is persuasive. It is untenable for Dr. Golob to assert that she lacked notice of the unprofessional nature of her conduct because of the alleged vagueness of the statutes. *See Hageseth v. Superior Ct.,* 150 Cal.App.4th 1399, 59 Cal.Rptr.3d 385, 403 (2007) (reasoning that "[t]he claim that petitioner and others like him who prescribe medications over the Internet lack notice of the unlawfulness of that conduct is unacceptable"). In fact, in her formal interview, Dr. Golob acknowledged that other physicians had been disciplined by the Board for activity similar to her practices. Her response then was not that she did not understand the ambit of the statutes but that those physicians had not established a physician-patient relationship to the degree that she had.

¶ 33 This court rejected a similar argument in *Webb:*

> The legislature could not have intended in adopting the "might be harmful or dangerous" standard of [A.R.S. § 32–1401(27)(q) ] to categorize as unprofessional, and permit the Board to sanction, any form of treatment that entails potential danger or harm. Surely the legislature intended rather to proscribe only those forms of treatment whose potential or actual harm is *unreasonable* under the circumstances, given the applicable standard of care. Finding such a qualification implicit in any sensible reading of the statute, we reject the argument that the statute is unconstitutionally vague.

202 Ariz. at 561 ¶ 27, 48 P.3d at 511.

¶ 34 Equally unavailing is Dr. Golob's argument that A.R.S. § 32–1401(27)(ss) "discriminates against medical doctors practicing telemedicine and unnecessarily prevents patients from receiving critical medical care without [a] compelling or even rational justification." The statute does not discriminate against physicians who prescribe over the internet; to the contrary, it holds them to the very same standard of care that is required of all physicians.

### D. Sanctions

¶ 35 Dr. Golob contends that the Board imposed inappropriate penalties. We review this claim for a clear abuse of the Board's discretion. *See Lathrop,* 182 Ariz. at 179, 894 P.2d at 722.

¶ 36 An administrative agency's discipline is "excessive only if it is so disproportionate to the offense as to shock one's sense of fairness." *Id.* (citation omitted). Although this may be Dr. Golob's first instance of formal discipline, the sanctions are not at all disproportionate to the unprofessional conduct in which she engaged, and they certainly do not shock our "sense of fairness."

### CONCLUSION

¶ 37 The judgment is affirmed.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge, and JON W. THOMPSON, Judge.

