NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBERT C. OSBORNE, *Plaintiff/Appellant,*

*v.*

ARIZONA MEDICAL BOARD, *Defendant/Appellee.*

No. 1 CA-CV 16-0250
FILED 6-13-2017

Appeal from the Superior Court in Maricopa County
No.  LC 2014-000407-001
The Honorable Crane McClennen, Judge (Retired)

**AFFIRMED**

COUNSEL

Waterfall, Economidis, Caldwell, Hanshaw and Villamana PC, Tucson
By James W. Stuehringer
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Michael Raine, Anne Froedge
*Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Margaret H. Downie delivered the decision of the Court, in which Judge Kenton D. Jones and Judge Donn Kessler joined.

---

D O W N I E, Judge:

¶1            Robert C. Osborne ("Appellant") appeals the superior court's order upholding the revocation of his license to practice medicine in Arizona by the Arizona Medical Board ("Board").  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2            The Board began investigating Appellant — a Board-certified anesthesiologist with a pain-management practice — after receiving a complaint from another physician expressing concern about possible "dangerous prescribing practices" as to patients SM and SJ and advising that the Arizona State Board of Pharmacy's prescription monitoring database ("CSPMP") revealed "extraordinarily high and potentially lethal doses of opioid analgesics filled for these patients as prescribed by Dr. Osborne."  The Board forwarded the complaint to Appellant and asked him to respond and provide the patients' medical records.  Appellant submitted the requested records and response.

¶3            Jerome Julian Grove, M.D., who is board-certified in anesthesiology and pain management, reviewed the matter as an outside medical consultant for the Board.  Dr. Grove identified several concerns, including: (1) opioid levels "excessive for the amount of pathology" noted in the patients' medical records; (2) inadequate opioid management; (3) inadequate communication with the patients' psychiatric treatment providers and lack of a "multidisciplinary approach;" and (4) unaddressed "red flags" regarding both patients.

¶4            The Board also asked Richard J. Ruskin, M.D. — a board-certified anesthesiologist with a subspecialty certification in pain management — to offer an assessment.  Dr. Ruskin opined that Appellant deviated from the standard of care in several respects and identified both actual and potential harm, including "perpetuat[ing] a situation of extreme opioid dependence in SM" and rendering SJ "extremely opioid

dependent for reasons that . . . were totally unnecessary and grossly inappropriate."

**¶5** The Board filed a formal complaint against Appellant, alleging violations of Arizona Revised Statutes ("A.R.S.") sections 32-1401(27)(e) ("[f]ailing or refusing to maintain adequate records on a patient") and 32-1401(27)(q) ("[a]ny conduct or practice that is or might be harmful or dangerous to the health of the patient or the public"). A five-day administrative hearing ensued before an administrative law judge ("ALJ").

**¶6** The ALJ recommended that the Board revoke Appellant's medical license. She found clear and convincing evidence that Appellant deviated from the standard of care in treating SM as follows:

- "[F]ailing to provide a coherent and organized history, physical examination, assessment, and plan of care . . . ."

- "[F]ailing to more thoroughly consider what other treatment modalities might be available rather than continuing to escalate SM's opioid dosage."

- "[F]ailing to document a clear rationale as to why [Appellant] felt it was necessary to accelerate SM's opioid dosage to the level of 600 morphine mg-equivalents per day."

- "[F]ailing to take into account [SM's] co-morbid conditions, including her 10-year history of methamphetamine addiction, as well as bipolar disorder, and failing to contact SM's behavioral health specialists in order to discuss these conditions in light of the high opioid doses she was requiring."

- "[F]ailing to recognize and intervene when there were clear signs of opioid misuse and diversion, including violations of SM's opioid agreement by the use of multiple pharmacies, SM's report of taking diverted methadone, and SM's report that her medication had been stolen by her son."

- Failing to maintain adequate records in violation of A.R.S. § 32-1401(2).[1]

The ALJ also found clear and convincing evidence that Appellant deviated from the standard of care in treating SJ as follows:

- "[F]ailing to provide a coherent and organized history, physical examination, assessment, and plan of care . . . ."

- "[F]ailing to provide clear justification as to why it was necessary to maintain SJ on the equivalent of almost 900 mg of morphine a day."

- "[F]ailing to clarify SJ's co-morbid conditions and work more closely with her rheumatologist and primary care physicians."

- "[F]ailing to more carefully consider what additional treatment modalities might have been available to SJ other than high-dose opioids."

- Failing to maintain adequate records as required by A.R.S. § 32-1401(2).

¶7        The ALJ concluded Appellant had engaged in unprofessional conduct, as defined by A.R.S. § 32-1401(27)(q), and violated A.R.S. § 32-1401(2).  In addressing the appropriate sanction, the ALJ cited the statutory directive that the Board "consider all previous nondisciplinary and disciplinary actions against a licensee," A.R.S. § 32-1451(U), and discussed prior Board matters involving Appellant.  In 2009, Appellant agreed to a letter of reprimand for violating the same statutes at issue here.  As to one patient in that case — MG — Appellant stipulated:

> The standard of care when prescribing medications for chronic non-malignant pain requires a physician to perform

---

[1]        Appellant does not challenge the determination that he failed to maintain adequate records as to both SM and SJ, so we do not address that issue. *See MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 219 Ariz. 297, 304 n.7, ¶ 19 (App. 2008) (arguments not developed on appeal are deemed waived).

an appropriate evaluation, to communicate and coordinate with the referring physician, to periodically assess the need for continued treatment and to investigate the patient for non-compliance. The standard of care also requires a physician to consider a new finding when increasing the dosage for opioids.

[Appellant] deviated from the standard of care because he did not perform an appropriate evaluation, he did not communicate and coordinate with MG's referring physician, he did not periodically assess MG's need for continued treatment, he did not investigate MG for non-compliance and he did not consider a new finding when he increased the dosage of MG's opioid medication.

Appellant also agreed that his deviation from the standard of care "could have caused MG to suffer an inadvertent or purposeful prescription opioid overdose."

¶8 In the same 2009 proceeding, Appellant admitted violating the standard of care as to three other patients "because he did not properly evaluate the patients, he did not communicate and coordinate with their prescribing physicians, he did not consider a multidisciplinary approach, and he did not closely monitor the patients for non-compliance or diversion." And in 2010, the Board issued Appellant an Order for Continuing Medical Education for "prescribing extremely high doses of oxycodone to a high risk patient with a previous history of self medication and psychiatric issues in violation of A.R.S. § 32-1401(27)(q)."

¶9 Based on Appellant's disciplinary history, "in addition to [his] repeated acts of unprofessional conduct," the ALJ concluded that he "engages in conduct or practices that are or might be harmful or dangerous to the health of his patients or the public." The ALJ recommended that the Board revoke Appellant's license.

¶10 Counsel for the Board asked the Board to adopt the ALJ's findings of fact, conclusions of law, and recommended order and to add findings and conclusions that more specifically addressed the harm or potential harm caused by Appellant's conduct. The Board unanimously adopted the ALJ's findings of fact, as well as the additional proposed finding of fact regarding harm, adopted the ALJ's conclusions of law without modification, and issued an order revoking Appellant's medical

license.  After unsuccessfully seeking rehearing, Appellant appealed to the superior court.

¶11            Appellant asked the superior court to hold an evidentiary hearing, which it declined to do.  After the superior court affirmed the Board's order, Appellant timely appealed to this Court.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), -2101(A)(1), and -913.

## DISCUSSION

¶12            Appellant identifies four issues on appeal:

(1) Whether the Board's "decision was unsupported by substantial evidence and contrary to law because it failed to follow *Webb* [*v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555 (App. 2002)]'s narrowing construction of A.R.S. §32-1401(27)(q) thereby applying the statute to Dr. Osborne in an unconstitutionally vague manner."

(2) Whether the Board's "decision violated due process and was an abuse of discretion because it failed to consider supplemental evidence which went to the heart of [the Board's] criticism of Dr. Osborne's care and treatment of patient SM."

(3) Whether the Board's "decision to adopt credibility findings regarding testifying patient SM was contrary to law and an abuse of discretion."

(4) Whether Appellant's "rights to due process were violated when the court below refused to conduct an evidentiary hearing to determine if any of the [Board's] investigative hierarchy communicated with any Board member regarding the Department of Justice and the DEA's criminal investigation of Dr. Osborne."

We view the record in the light most favorable to upholding the Board's decision. *Golob v. Ariz. Med. Bd.*, 217 Ariz. 505, 507 n.1, ¶ 1 (App. 2008). Substantial evidence exists to support an administrative decision "even if the record also supports a different conclusion." *Ritland v. Ariz. State Bd. of Med. Exam'rs*, 213 Ariz. 187, 189, ¶ 7 (App. 2006).

## I.     A.R.S. § 32-1401(27)(q) Violation

¶13      The Board concluded Appellant violated A.R.S. § 32-1401(27)(q), which includes within the definition of "unprofessional conduct" any "conduct or practice that is or might be harmful or dangerous to the health of the patient or the public." Appellant contends the Board applied this statute "in an unconstitutionally vague manner." We review questions of law and issues of statutory interpretation *de novo*. *Webb*, 202 Ariz. at 557, ¶ 7.

¶14      In *Webb*, we noted the breadth of the "might be harmful or dangerous" language in § 32-1401(27)(q).[2] *Id.* at 561, ¶ 25. We observed that there is "potential for harm in most prescriptive medication; and some forms of treatment – radiation and chemotherapy, to name two – involve near certainty of harm, yet harm accepted and acceptable in the effort to alleviate still greater harm." *Id.* Interpreting the statute in a manner comporting with due process, we held that it applies only to "those forms of treatment whose potential or actual harm is *unreasonable* under the circumstances, given the applicable standard of care." *Id.* at ¶ 27.

¶15      Neither the relevant statutes nor *Webb* requires the Board to make an express finding that potential or actual harm is "unreasonable under the circumstances." "The legislature knows how to make written findings a requirement." *Hart v. Hart*, 220 Ariz. 183, 187, ¶ 17 (App. 2009); *see, e.g.*, A.R.S. §§ 13-702(B) (requiring factual findings on aggravating or mitigating factors); 25-403(B) (mandating specific findings in contested legal decision-making or parenting time matters); 8-538(A) (factual findings required when terminating parental rights). We note, however, that such a finding is not difficult to make, and in cases presenting a close call as to the reasonableness of harm specifically found by the Board, would assist reviewing courts in determining its adherence to the statutory standard. As we discuss *infra*, though, this case presents no such "close call."

¶16      In its supplemental finding of fact, the Board stated: (1) "Both Dr. Ruskin and Dr. Grove testified that SM was harmed by [Appellant's] conduct in that she was placed in a situation of extreme opioid dependence;" (2) "Dr. Ruskin stated in his report that patient SJ

---

2       *Webb* interpreted an earlier version of the statute, though the relevant language remains unchanged.

was unnecessarily rendered extremely opioid dependent, as well;" and (3) "[T]here was the potential for overdose and death." Although the first two findings could be construed as mere recitations of witness testimony, read in context, the Board is clearly adopting the quoted testimony as findings of fact. Moreover, the express finding that "there was the potential for overdose and death" clearly satisfies the requirement that the statute be applied only to treatment "whose potential or actual harm is *unreasonable* under the circumstances, given the applicable standard of care." *Webb*, 202 Ariz. at 561, ¶ 27. Appellant does not suggest that potential overdose or death was reasonable under the circumstances for either patient. Indeed, at oral argument before this Court, Appellant conceded that, "If a patient had died, that would not be reasonable."

¶17 The Board's supplemental finding is sufficient to comply with *Webb*, and the record supports that finding. When SM began treating with Appellant, she was taking five oxycodone 30 mg tablets per day. At SM's second appointment, Appellant wrote that she was "stabilized on her medications," yet he doubled her prescription to ten 30 mg tablets per day, writing that, "I have *slightly* increased her medications and will try to be supportive of her." (Emphasis added). Appellant later increased SM's dosage again — to 360 tablets per month — although a progress note states she was "stabilized on her medicine" with no "undercurrent changes."

¶18 The Board could reasonably conclude there was no justification for or documentation explaining the substantial increases in opioids. Dr. Ruskin testified that instead of exploring alternative treatment modalities, Appellant simply prescribed "opioids, [and] more opioids." When questioned about harm, Dr. Ruskin testified that SM "was put in a situation of extreme opioid dependence" and that "[d]eath from opioid overdose, whether it be intentional or unintentional, that's clearly a risk." He stated that "short of death, you have issues of morbidity, ending up in the emergency room, requiring treatment for drug overdose, requiring treatment for side effects related to opioid therapy . . . [and] the potential for addiction." At the conclusion of Dr. Ruskin's cross-examination, the following exchange occurred:

> Q. It's your belief that Dr. Osborne put SM at the risk of death?
>
> A. Yes.
>
> Q. And you say that because of the level of opioids?

A.      I say that because of the level of opioids primarily, yes.

Q.      Even though there's no ceiling for opioids, correct?

A.      I'm not sure what that means.  It still kills people.

Q.      All right.

A.      That's a ceiling.

¶19      The record also substantiates that although SM was under psychiatric care (including prescribed medications) for bipolar disorder and had a ten-year history of methamphetamine abuse, Appellant did not coordinate with her mental health providers, despite evidence that psychiatric disease "is a known risk factor for opioid addiction and abuse."  The risks were heightened by SM signing a document that prohibited Appellant from sharing information with her other healthcare providers, which Dr. Grove testified was a "tremendous concern" because psychiatric medications interact with pain medications, and Appellant would need to communicate with this "high risk" patient's mental health providers, or at the very least, "have that avenue open."

¶20      Evidence also established Appellant's failure to recognize and intervene in the face of "clear signs" of opioid misuse and diversion by SM.  Appellant had SM sign an opioid agreement that stated:

> I agree not to obtain any narcotics from any other physician unless you are notified.  I agree to obtain narcotics from only one pharmacy at a time, and will inform you of any change in pharmacy use.

Testimony established the importance of using only one pharmacy as a means of tracking a patient's medication usage due to the lack of communication between pharmacies.  During a three-month span preceding her treatment with Appellant, SM received opioid prescriptions from 11 different providers and filled those prescriptions at four different pharmacies.  And while treating with Appellant, SM violated the opioid agreement by filling her prescriptions at multiple pharmacies and obtaining narcotics from other prescribers.  Nothing in Appellant's records indicate "he was aware of or had addressed the violations of the narcotics agreement with SM."

¶21 SM also consistently sought early refills, suggesting she was using her medications in excess of prescribed dosages. Appellant did not question her about this issue. After running out of her medication on one occasion, SM took methadone obtained from another person. Appellant advised her that was "unacceptable" and required her to drug-test as a result. According to Dr. Grove, SM's conduct was "extremely concerning and would typically completely change my plan of care for that patient." On a different occasion, SM reported that her son had stolen her medication. Dr. Grove testified that, given these red flags, Appellant fell below the standard of care in obtaining only four drug screens during his treatment of SM.

¶22 Patient SJ saw Appellant for more than four years for chronic pain. The only plan of care evident from Appellant's records was a regimen of opioids that escalated over time. Dr. Grove testified it was inappropriate to expose SJ to such amounts of "highly addictive substances." He further opined that Appellant's "level of assessment in terms of the toxicology" was substandard and that the combination of SJ's medications could have caused respiratory depression or death.

¶23 Testimony established that SJ's history of sexual abuse and illicit drug use raised red flags and that sexual abuse "is a known variable for risk stratification for mismanagement of medications." As with SM, Appellant did not address SJ's violations of her opioid agreement after she obtained prescriptions from multiple pharmacies. Nor did he address SJ's repeated early refills. Appellant documented an incident in which SJ reported that her dog got into her purse and destroyed her pills. Appellant wrote in her record that he was "very critical of this. This is her only chance." Dr. Grove described this incident as a possible indication of diversion or addiction and testified that Appellant fell below the standard of care by asking SJ to submit to only one drug screen that pre-dated the report of a dog destroying her opioids.

¶24 We are not faced here with "a physician who came to work with a head cold," *Webb*, 202 Ariz. at 561, ¶ 24, or a record suggesting only harm or potential harm reasonable under the circumstances. On the contrary, substantial evidence established *unreasonable* potential harm caused by Appellant's deviations from the standard of care, including death and overdose. Under these circumstances, we reject Appellant's contention that A.R.S. § 32-1401(27)(q), as applied by the Board, violated his due process rights.

## II.     Motion to Supplement Administrative Record

¶25        After the evidentiary hearing before the ALJ concluded, Appellant moved to supplement the administrative record with evidence he described as newly discovered.  The evidence — all of which was created after the hearing — consisted of SM's medical records from other healthcare providers, an operative report of surgery occurring after the hearing, and Appellant's own records regarding SM's post-hearing visits. The Board opposed the motion, and the ALJ denied it.

¶26        In arguing he was deprived of an opportunity to present a complete defense, in violation of due process, Appellant cites the following finding by the ALJ:

> At the time of the hearing, close to four years after SM began treatment with [Appellant], she had not had the recommended surgery.

Contrary to Appellant's assertion, the ALJ's finding is not "simply untrue."  It is undisputed that SM did not undergo surgery until *after* the hearing.  Moreover, the quoted finding appears in the context of a discussion about Appellant's failure "to more thoroughly consider what other treatment modalities might be available rather than continuing to escalate [SM's] opioid dosage."  The point the outside medical consultants and Board were making is that, for almost four years, Appellant failed to revisit or amend his initial treatment plan for SM — smoking cessation and surgery — focusing instead on an escalating dosage of narcotics without explanation or justification.  Under these circumstances, we agree with the Board that "[a]dmitting evidence of an eventual surgery would not have changed the experts' opinions about the four years of treatment before surgery."

## III.    SM's Credibility

¶27        Appellant next contends the Board erred by adopting the ALJ's credibility findings regarding SM.  We disagree.

¶28        In discussing the theft of opioids by SM's son, the ALJ found:

> SM's testimony on this issue was inconsistent.  SM first testified that she was hospitalized for seven days in August 2011, and that her medications were stolen during her hospitalization.  When the Board's counsel pointed out that

SM had been hospitalized for seven days in June 2011, SM then reported she was hospitalized again in August 2011.[3] During an interview with [Appellant's] counsel on October 18, 2013, SM stated she and her husband had gone to a casino in Tucson and discovered the medications were missing when they returned.

In her conclusions of law, the ALJ stated:

SM's inconsistency as to when the medications were taken by her son calls into question the veracity of her story. Had [Appellant] more clearly recorded in his progress notes the report he received from SM regarding the incident, there would be a contemporaneous version of events that could have shed more light on the events.

¶29 Because the ALJ observes the demeanor and attitude of witnesses, "the Board should give deference to [her] credibility findings" and may "overrule these findings only if it finds evidence in the record for so doing." *Ritland*, 213 Ariz. at 191, ¶ 14. A reviewing court should uphold a Board's credibility finding "if there is substantial evidence in the record supporting it." *Id.* at 191–92, ¶ 15.

¶30 Appellant's contention that the ALJ "failed to take into account SM's mental health issues and periodic confusion" is, in essence, a request to reweigh the ALJ's first-hand observations and come to a contrary conclusion. However, nothing in the record or the law required the Board to do so. The record does not support Appellant's suggestion that the ALJ disregarded the entirety of SM's testimony based on the questionable veracity of her story about the medication theft. The credibility finding expressly relates to that one incident, and the ALJ credited other testimony by SM in her findings.

## IV. Request for Evidentiary Hearing in Superior Court

¶31 Finally, Appellant challenges the denial of his request for an evidentiary hearing in the superior court to explore the Board's involvement in or knowledge about ongoing criminal investigations of him being conducted by the Department of Justice and Drug Enforcement

---

[3] SM further testified she could not remember the dates of her hospitalizations because the medication she was taking made her memory "really foggy."

Administration. In his superior court filings, Appellant contended the Board withheld information from him about communications with investigating law enforcement entities, while providing Dr. Ruskin (and perhaps others) with such information. The Board denied these allegations, avowing that the "previously hidden information" notation in its internal files referred to the fact it did not give Dr. Ruskin the report authored by Dr. Grove or the Staff Investigational Review Committee ("SIRC") report before he submitted his initial report.

¶32 The superior court ordered the Board to disclose documents relevant to this issue and permitted Appellant to depose Board Investigator Elle Steger. The Board complied. Appellant thereafter filed a renewed request for an evidentiary hearing, which the court denied. We review that ruling for an abuse of discretion. *Any Charity Unlimited, LLC v. Ariz. Dep't of Transp.*, No 1 CA-CV 14-0789, 2016 WL 2909386, at * 9, ¶ 38 (App. May 19, 2016).

¶33 Steger testified that she did not speak with any Board member, Dr. Ruskin, or the ALJ regarding ongoing criminal investigations. In terms of the "previously hidden information" notation, she explained that the phrase referred to the Grove and SIRC reports that were initially withheld from Dr. Ruskin so as not to compromise his independent assessment. She testified that Board members had no access to internal documents referring to a "US Department of Justice request" or to communications Board staff had with investigating entities.

¶34 There is no evidence or inference that any Board member, Dr. Ruskin, or the ALJ considered, or even had knowledge of the ongoing criminal investigations of Appellant. The documents produced pursuant to the superior court's order revealed only that Board *staff* members communicated with law enforcement. "Without a showing of actual bias or prejudice," Board members and the ALJ are presumed to be fair. *Lathrop v. Ariz. Bd. of Chiropractic Exam'rs*, 182 Ariz. 172, 180 (App. 1995); *see also Hourani v. Benson Hosp.*, 211 Ariz. 427, 433, ¶ 21 (App. 2005) ("All decision makers, judges and administrative tribunals alike, are entitled to a presumption of 'honesty and integrity.'" (citation omitted)). "[M]ere speculation regarding bias" is insufficient to rebut the presumption. *Pavlik v. Chinle Unified Sch. Dist. No. 24*, 195 Ariz. 148, 152, ¶ 11 (App. 1999).

¶35 The evidentiary hearing contemplated by A.R.S. § 12-910 offers a "safety net for the unusual case in which new evidence, had it been presented in the administrative proceeding, would have changed the

decision." *Shaffer v. Ariz. State Liquor Bd.*, 197 Ariz. 405, 409, ¶ 18 (App. 2000). Nothing in the record suggests that an evidentiary hearing was necessary for the superior court to make its statutorily required determinations. *See* A.R.S. § 12-910(A), (E) ("[T]he court shall hold an evidentiary hearing . . . to the extent necessary to make the determination" whether the agency's action was unsupported by substantial evidence, contrary to law, arbitrary and capricious, or an abuse of discretion.). Under these circumstances, the court did not abuse its discretion by denying Appellant's requests for an evidentiary hearing.

**CONCLUSION**

¶36 For the foregoing reasons, we affirm the decision of the Arizona Medical Board.



AMY M. WOOD • Clerk of the Court
FILED: AA