NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DAVID A. RUBEN, *Plaintiff/Appellant*,

*v.*

ARIZONA MEDICAL BOARD, *Defendant/Appellee*.

No. 1 CA-CV 18-0079
FILED 2-7-2019

Appeal from the Superior Court in Maricopa County
No. LC2017-000003-001
The Honorable Patricia A. Starr, Judge

**AFFIRMED**

COUNSEL

Robert S. Wolkin PC, Tucson
By Robert S. Wolkin
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Michael Duval Raine
*Counsel for Defendant/Appellee*

―――――――――――――――

**MEMORANDUM DECISION**

Presiding Judge Paul J. McMurdie delivered the decision of the Court, in which Judge Randall M. Howe and Judge Jennifer B. Campbell joined.

―――――――――――――――

**M c M U R D I E**, Judge:

¶1        David A. Ruben appeals the superior court's order upholding the February 9, 2016 Decision ("Decision") of the Arizona Medical Board placing Dr. Ruben on probation and restricting his practice for two years. For the following reasons, we affirm the Decision.

## FACTS AND PROCEDURAL BACKGROUND

¶2        The Board began investigating Dr. Ruben, a board-certified psychiatrist with a pain-management practice, pursuant to Arizona Revised Statutes ("A.R.S.") section 32-1451, after receiving complaints regarding Dr. Ruben's controlled-substance prescribing practices from a patient's (GM) relative and a pharmacy in relation to seven other patients (MB, PG, AT, FS, ME, DB, CD). While the Board investigated these complaints, it received notice that in 2013 the Drug Enforcement Agency ("DEA") suspended Dr. Ruben's controlled-substance prescribing privileges in connection with conduct for which Dr. Ruben had already been subject to discipline by the Board in 2010 in accordance with a consent agreement (the "DEA matter").

### Prior Discipline

¶3        In 2009, the Board investigated Dr. Ruben for inappropriately prescribing opioids to a patient without properly assessing the patient's need and monitoring the risk over the course of the treatment. As a result of the investigation, Dr. Ruben entered into a consent agreement that included continuing medical education and periodic chart review of his patients. In 2010, the Board began investigating Dr. Ruben for similar prescribing practices and violations based on complaints received by the Board and the patient charts collected for review pursuant to the prior consent agreement. Dr. Ruben again entered a consent agreement with the Board (the "2010 Consent Agreement") that restricted Dr. Ruben's ability to prescribe opioids for a year.

¶4         In 2008, the DEA initiated an investigation into Dr. Ruben's practice, sending two undercover "cooperating sources" acting as patients. The practices in question were similar to the prescribing practices that were the subject of the 2009 and 2010 consent agreements. In 2011, the DEA alleged Dr. Ruben violated federal law by prescribing controlled substances without a legitimate medical purpose. For support, the DEA proffered evidence from the 2008 undercover investigation and the prior consent agreements between Dr. Ruben and the Board. The DEA Administrator agreed with the federal administrative law judge, who oversaw the hearing, concluding that the DEA did not establish Dr. Ruben violated federal law with respect to the two "undercover visitors." However, based on the admissions and terms of the consent agreements with the Board, the DEA Administrator found sanctions were appropriate. In 2013, the DEA suspended Dr. Ruben's DEA Certificate for one year.

**Current Allegations**

¶5         The Board forwarded the current complaints to Dr. Ruben, asked him to respond, and requested the patients' medical records. Dr. Ruben submitted the records and responses for each allegation. The Board forwarded the complaints, Dr. Ruben's responses, and the patients' medical records to two experts: Dr. Ashby and Dr. Peairs. Each of the Board's experts reviewed four of the patient files and rendered opinions regarding Dr. Ruben's professionalism. After receiving the experts' opinions, the Board, through counsel in the Attorney General's office (the "State"), filed a complaint and notice of hearing alleging that Dr. Ruben had engaged in unprofessional conduct as defined by: A.R.S. § 32-1401(27)(r) ("conduct or practice that is or might be harmful or dangerous to the health of the patient or the public"); A.R.S. § 32-1401(27)(e) (failing to maintain adequate patient records); A.R.S. § 32-1401(27)(a) (violating any federal or state law); A.R.S. § 32-1401(27)(t) (violating or attempting to violate any of the provisions under Chapter 13 relating to medicine and surgery); and A.R.S. § 32-1401(27)(q) ("sanctions imposed by an agency of the federal government").[1] The complaint also alleged that Dr. Ruben violated A.R.S. § 32-1451.01 and A.R.S. § 32-3206 when he disclosed investigation information to a patient to assist in his defense.

---

[1]         Although the Arizona Legislature has amended statutes cited in this decision after the date of the first complaint to the Board, the revisions are not relevant to this appeal. Thus, unless otherwise noted, we cite to the current version of the statutes.

¶6        The State presented the evidence the Board obtained in its investigation during an eight-day administrative hearing before an administrative law judge ("ALJ"). Dr. Ruben testified on his own behalf, as did his two experts and several of his patients. The ALJ concluded: (1) Dr. Ruben committed unprofessional conduct as defined by A.R.S. § 32-1401(27)(a) and (q) in relation to the DEA matter; (2) Dr. Ruben committed unprofessional conduct as defined by A.R.S. § 32-1401(27)(t) by violating A.R.S. § 32-3206(B) when Dr. Ruben disclosed information from Dr. Ashby's report to a patient; and (3) Dr. Ruben committed unprofessional conduct as defined by A.R.S. § 32-1401(27)(e) by failing to document conversations he had with several patients in connection with his defense in this case. The ALJ determined there was not clear and convincing evidence that Dr. Ruben deviated from the standard of care approved by a respectable minority of allopathic physicians in relation to his treatment of the eight patients, and thus did not commit unprofessional conduct as defined by A.R.S. § 32-1401(27)(r). Additionally, because Dr. Ruben had already been twice punished for the same conduct that was the subject of the DEA Matter, the ALJ concluded that the A.R.S. § 32-1401(27)(a) and (q) violations did not warrant additional discipline and recommended that the Board enter a decree of censure against Dr. Ruben.

¶7        Before the Board met to review the ALJ's recommendation, the State presented the Board with a motion containing its proposed findings and conclusions. The State's motion "urge[d] the Board to accept, modify, and reject, in part, the ALJ's decision," and requested the Board revoke Dr. Ruben's license. The State recommended the Board adopt the ALJ's findings of fact, but proposed modifications that more accurately reflected the qualifications of the State's witnesses, while noting the lack of pain-management expertise of Dr. Ruben's experts. The Board adopted the State's proposed modifications to the findings in its entirety.

¶8        Next, the Board considered whether it should adopt the ALJ's conclusions of law, the State's version, or create its own. Some Board members took issue with prohibiting the use of investigation information to mount a proper defense. After an executive session with independent counsel, the Board rejected the ALJ's conclusions of law pertaining to Dr. Ruben's alleged unprofessional conduct for sharing investigation materials with a patient to aid in his defense. The Board adopted the State's remaining proposals. Absent from the remaining conclusions was the ALJ's conclusion that the Board could not discipline Dr. Ruben for the DEA Matter and the conclusion that characterized Dr. Ashby's position as "extreme" and a "substantial minority" view. The accepted conclusions reversed the ALJ's conclusions regarding Dr. Ruben's treatment of the eight

patients and added conclusions that his treatment of the patients constituted unprofessional conduct.

¶9        The Board rejected the State's recommendation to revoke Dr. Ruben's license. Instead, the Board issued a decree of censure, placed him on probation, and restricted his practice to prohibit him from "prescribing, administering or dispensing, any Schedule II controlled substances for a period of two years." The Board's independent counsel advised: "the law requires that [the Board] state a rational [for modifying or rejecting the ALJ's findings and conclusions]. For that [the Board] can either state that or adopt the State's rationale as set forth in its motion." The Board opted to adopt the State's rationale, and as written justification for the modification of the ALJ's decision it submitted the following statement with the order:

> The Board modified the Findings of Fact and Conclusions of Law as requested by the State in its "Motion to Modify/Reject ALJ's Recommended Decision," enclosed, and for the purposes discussed therein. Additionally, the Findings of Fact, as modified, based upon the evidence presented in the case, support the modified Conclusions of Law. The Board rejected the ALJ's recommended Conclusions of Law 24 through 26 as it found that MB was a witness assisting in Respondent's defense and did not improperly view case material.

> The Board modified the ALJ's recommended Order to include probation and a practice restriction in addition to the recommended Decree of Censure, in order to best protect the public.

¶10        Dr. Ruben moved for rehearing. The State opposed the motion for rehearing but conceded that it had failed to allege that Dr. Ruben had maintained inadequate records under A.R.S. § 32-1401(27)(e) for MB, FS, and ME, which was the basis of Conclusion 7, and stipulated to a limited Board review to eliminate the unsupported conclusion. The Board issued a modified Decision deleting Conclusion 7.

¶11        Dr. Ruben appealed to the superior court, which affirmed the Board's Decision. Dr. Ruben timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), -2101(A)(1), and -913.

## DISCUSSION

¶12        On appeal, Dr. Ruben argues the Board[2] erred by: (1) concluding he committed unprofessional conduct by receiving DEA sanctions; and (2) imposing sanctions without complying with A.R.S. § 41-1092.08(B). We will affirm the Board's action unless it is contrary to law, arbitrary and capricious, an abuse of discretion, or not supported by substantial evidence. A.R.S. § 12-910(E); *Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436, ¶ 11 (App. 2009). The Board's modified Decision concluded that Dr. Ruben's conduct was unprofessional as defined by A.R.S. § 32-1401(27)(a) (violating any federal or state law), A.R.S. § 32-1401(27)(q) ("sanctions imposed by an agency of the federal government"), and A.R.S. § 32-1401(27)(r) ("conduct or practice that is or might be harmful or dangerous to the health of the patient or the public").

**A.**      **The Board Erred by Finding that Dr. Ruben Committed Unprofessional Conduct as Defined by A.R.S. § 32-1401(27)(a) and (q).**

¶13        The Board concluded that Dr. Ruben committed unprofessional conduct as defined by A.R.S. § 32-1401(27)(a) and (q) because the DEA suspended Dr. Ruben's certificate under the federal Controlled Substances Act. Dr. Ruben maintains that because the conduct supporting the DEA action was the subject of prior Board discipline, the Board could not charge him again for unprofessional conduct. We agree.

     **1.**      **The Board May Not Charge Dr. Ruben with Additional Allegations of Unprofessional Conduct for Conduct Encompassed in the Prior Disciplinary Actions.**

¶14        As noted above, in 2010 Dr. Ruben entered a consent agreement with the Board and accepted responsibility and sanctions for his conduct. In 2013, the DEA suspended Dr. Ruben's prescribing privileges based on his conduct supporting the 2010 Consent Agreement. The Board concedes that "the misconduct that gave rise to the Board's 2009 and 2010 consent agreements was the sole basis for the DEA's 2013 Order, given that the federal government had not proven other, unrelated violations that

---

[2]      The Board is an "agency" under the Administrative Procedure Act, A.R.S. § 41-1001(1), and the Board's disciplinary actions must comply with the procedures therein. *See* Uniform Administrative Hearing Procedures, A.R.S. §§ 41-1092 to -1092.12.

arose from an undercover operation." The Board rejected the ALJ's conclusion that:

> because Dr. Ruben has already been punished twice for the acts that [the DEA Administrator] found constituted cause to suspend his DEA certificate under the federal Controlled Substances Act, the Administrative Law Judge in this matter does not find that the Board established by clear and convincing evidence that [the Administrator's] decision furnishes additional grounds to impose a third round of sanctions against Dr. Ruben's license or ability to practice allopathic medicine in the State of Arizona.

¶15    Dr. Ruben argues that the 2010 Consent Agreement precludes the Board from charging him again with unprofessional conduct as defined by A.R.S. § 32-1401(27)(a) and (q) for the underlying conduct. "The Board does not agree, however, that [] Dr. Ruben's misconduct was the factual basis for the subsection ([q]) violation. That violation—by its very nature—was based on only the fact that the DEA had restricted Dr. Ruben's prescribing privileges." The Board argues that it could not have alleged Dr. Ruben committed unprofessional conduct as defined by A.R.S. § 32-1401(27)(q) until the DEA issued its decision, several years after the 2010 Consent Agreement.

¶16    A consent to discipline is akin to a plea agreement in that a doctor stipulates to a specific form of discipline in lieu of a hearing. *See c.f. Coy v. Fields*, 200 Ariz. 442, 445, ¶ 9 (App. 2001) ("Plea agreements are contractual in nature and subject to contract interpretation."). We review a contract to determine the intent of the parties, considering the plain meaning of the words in the context of the contract as a whole. *Dunn v. FastMed Urgent Care PC*, 245 Ariz. 35, 38 ¶ 10 (App. 2018).

¶17    The 2010 Consent Agreement states:

> This Order is the *final disposition* of case numbers MD-09-0131A and MD-09-0250A, MD-09-0926A, MD-09-1263A and MD-10-0100A. Moreover, it is agreed that *there will be no further charges brought against Respondent arising out of past or current patient charts* that the Board has taken possession of to date.

(Emphasis added.) The Board argues that the language was in reference to the "chart reviews" ordered by the consent agreement in 2009, and nothing

in either agreement precluded it from pursuing further discipline. We disagree.

**¶18**　　　　Looking at the plain meaning of the words in the consent agreement, in the context of an agreement made in lieu of a hearing, and resulting in discipline, the reasonable interpretation of the provision is that the Board agreed not to institute further disciplinary proceedings against Dr. Ruben for conduct that the Board either knew, or had reason to know, from the patient charts.

**¶19**　　　　The Board argues that "[h]ad the federal government acted first, the Board could still bring a complaint on the merits underlying the 2009 and 2010 consent agreement and include the subsection ([q]) violation." While this statement is true, it was no more or less true that Dr. Ruben violated federal law and was subject to DEA sanctions at the time the Board entered into its agreements. It is the *unprofessional conduct* that the Board was sanctioning. If the Board knew or had reason to know of potential federal violations at the time of either consent agreement, it could have determined the federal violations were deserving of increased sanctions. However, the finding by the DEA of unprofessional conduct by Dr. Ruben did not change the nature of the conduct already sanctioned by the Board.

**¶20**　　　　Nevertheless, the Board charged Dr. Ruben with violations that indisputably "arose out of" the subject patient charts. Such a breach warrants relief in the form of specific performance under principles of contract law. *See Hovey v. Superior Court In & For County of Maricopa*, 165 Ariz. 278, 281–82 (dismissal was appropriate under contract principles when the state breached its part of the bargain by bringing subsequent charges). Dr. Ruben stated to the Board that he would not have entered into the 2010 Consent Agreement if he had known that it "was an empty promise." *See Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."). Thus, the Board improperly concluded that Dr. Ruben was guilty of additional unprofessional conduct for receiving DEA sanctions and violating federal law based on the same conduct it had already sanctioned.

### 2.　　　Discipline is Based on Unprofessional Conduct.

**¶21**　　　　Underlying conduct is either unprofessional or it is not. Once a doctor is found to have committed unprofessional conduct, it is the

underlying *unprofessional conduct* that is subject to discipline. An act that may be designated as unprofessional under several subsections is nonetheless one instance of unprofessional conduct. The Board, however, has broad discretion to sanction "as it deems appropriate" under the circumstances. *See* A.R.S. § 32-1451(M) ("Any doctor of medicine who after a formal hearing is found by the board to be guilty of unprofessional conduct . . . is subject to censure, probation as provided in this section, suspension of license or revocation of license or any combination of these, including a stay of action, and for a period of time or permanently and under conditions *as the board deems appropriate for the protection of the public health and safety and just in the circumstance*." (emphasis added)); *see also* A.R.S. § 12-910(E) ("The court shall affirm the agency action unless the court concludes that the agency's action is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion."). Additionally, "[i]n determining the appropriate disciplinary action . . . the board shall consider all previous nondisciplinary and disciplinary actions against a licensee." A.R.S. § 32-1451(U).

**¶22**        While it was error to charge Dr. Ruben again for unprofessional conduct based on the same conduct sanctioned in the 2010 Consent Agreement, the Board alternatively argues that nothing indicates that it imposed discipline based on the DEA matter. We agree. The Board rejected the State's proposed discipline—to revoke Dr. Ruben's license—and instead issued a decree of censure, placed Dr. Ruben on probation for two years, and restricted his prescribing privileges for two years with respect to Schedule II controlled substances only. The Board extensively discussed the appropriate discipline, considering Dr. Ruben's prior misconduct, and it imposed discipline that targeted "activities that [it] felt were dangerous to the public," without overly restricting Dr. Ruben's practice. The discipline was narrowly tailored to curtail the current unprofessional conduct and was not excessive.

**B.      The Board's Written Justification Was Sufficient to Support the Board's Modification of the ALJ's Decision.**

**¶23**      Next, Dr. Ruben argues that the Board did not provide an adequate written justification for rejecting the ALJ's conclusions of law 10, 13, and 14 as required by A.R.S. § 41-1092.08(B). He contends that because the Board's modifications did not satisfy the statutory requirement, the ALJ's conclusions remain.

**¶24**      At the time of the Board's decision, the Board's obligations were as follows:

> If the [Board] rejects or modifies the [ALJ's] decision, [it] must file with the office . . . and serve on all parties a copy of the administrative law judge's decision with the rejection or modification and a written justification setting forth the reasons for the rejection or modification.

A.R.S. § 41-1092.08(B) (2015). The statute has since been amended to require a written justification for a modification or rejection of *each* finding of fact or conclusion of law. A.R.S. § 41-1092.08(B). Dr. Ruben argues that: (1) the applicable amendment to A.R.S. § 41-1092.08(B) was a clarification, rather than a change in law, thus we should use the amendment to interpret the prior version; and (2) because the Board failed to provide a written justification for the rejections, the ALJ's conclusions remain intact and "make the board order for sanctions unsupportable on any theory." We disagree with Dr. Ruben. The amendment to A.R.S. § 41-1092.08 changed the law, and under the prior version of the law—which is applicable to this Decision—the justifications presented were sufficient to support the Board's Decision that Dr. Ruben engaged in unprofessional conduct.

### 1.      The Amendment to A.R.S. § 41-1092.08 is a Change in Law.

**¶25**      Dr. Ruben argues that the amendment clarifies the prior version of A.R.S. § 41-1092.08(B), and thus the Board's written justification was insufficient under the statute. Conversely, the Board argues the amendment is a change of law and the Board's written justification sufficiently satisfy A.R.S. § 41-1092.08(B) but admits that "there are no published decisions interpreting the requirement."

**¶26**      There is a presumption that an amendment changes rather than clarifies the existing law. *Microchip Tech. Inc. v. State*, 230 Ariz. 303, 308, ¶ 18 (App. 2012). An amendment enacted shortly after an earlier version of a statute that clarifies ambiguities may rebut the presumption. *State v.*

*Sweet*, 143 Ariz. 266, 271 (1985) (an amendment enacted one year after the original version indicated an intent to clarify the earlier statute). If, however, the amendment is enacted a considerable amount time after the earlier version and contains significant additions to or departures from the prior law, this indicates that the legislature intended to change the law. *San Carlos Apache Tribe v. Superior Court ex rel. County of Maricopa*, 193 Ariz. 195, 209–10, ¶ 31 (1999). Here, there is little doubt the amendment was intended to change the law.

**¶27**　　　　The 2017 amendment was enacted as part of the Right to Earn a Living Act (the "Act"), which limits occupational regulations that interfere with an individual's "fundamental civil right" to pursue a chosen profession and directs the courts to apply "heightened judicial scrutiny" when reviewing licensing cases. *See* Right to Earn a Living Act, 2017 Ariz. Sess. Laws, ch. 138, § 6 (1st Reg. Sess.). The amendment was passed seventeen years after the enactment of the prior version of A.R.S. § 41-1092.08(B). *See San Carlos Apache*, 193 Ariz. at 209, ¶ 30 ("[T]o suggest that the 1995 Legislature knows and can clarify what the 1919 or 1974 Legislatures intended carries us past the boundary of reality and into the world of speculation."). The amendment did not merely modify the Board's requirement to provide a written justification setting forth the reasons for rejection or modification of *each* finding of fact or conclusion of law, but it also requires the Board to send the president of the senate and the speaker of the house of representatives the written justification for any modification or rejection of a conclusion of law. A.R.S. § 41-1092.08(B). Given all of the amendment's additional requirements to the Board's duties, it constitutes a significant change to the prior law.

### 2.　　The Board's Written Justification Was Sufficient Under the Prior Statute.

**¶28**　　　　Alternatively, Dr. Ruben argues that with the amendment's changes "[t]here certainly appears to be a certain sensitivity on the part of the legislature, acknowledging that Boards have been far too lax in explaining themselves about changes to ALJ decisions." Dr. Ruben urges that we recognize the legislature's intent and require more than a general explanation for the Board's departure from the ALJ decision.

**¶29**　　　　Additional legislative activity supports Dr. Ruben's assertion regarding legislative intent. When signing the Act, the Governor included a supporting statement:

It is simply unjust for government to decide who can and cannot earn a living except when absolutely necessary to protect public health and safety. All too often, occupational licensing boards create fiefdoms demanding individuals face burdensome training requirements, excessive fees and fines, and arbitrary investigations.

Governor's Approval Message, Right to Earn a Living Act, 2017 Ariz. Sess. Laws, ch. 138 (1st Reg. Sess.) (Apr. 5, 2017). The Governor encouraged the legislature to make further changes to reform occupational licensing boards. In the following session, the legislature amended A.R.S. § 12-910(E), directing a court reviewing an agency decision to decide questions of law without deference to any previous determination that may have been made on the question by the agency.

¶30 However, the subsequent actions of the Governor and legislature provide additional evidence of the intent of both elected branches of government to change the law in favor of increasing judicial scrutiny of — and agency accountability for — occupational licensing actions. The Board issued this decision before the amendment was enacted and cannot be bound by law not in effect at the time of its decision. Even if Dr. Ruben were correct that the Board did not provide an adequate justification to support the modification, the appropriate remedy would be to remand to the Board to allow it the opportunity to comply with the statutory procedural requirement. *See Caldwell v. Ariz. State Bd. of Dental Exam'rs*, 137 Ariz. 396, 401 (App. 1983).

¶31 As the superior court noted, incorporation of the State's motion to serve as the Board's reasoning is not the "best practice," but we are not tasked to determine the best practice. We are tasked to determine if the Board's modification of the ALJ's decision is supported by the record.

In this case, and under the prior statute, we conclude the justification for the modification was sufficient.[3]

### 3. Substantial Evidence Supports the Board's Decision.

**¶32** The Board found Dr. Ruben guilty of unprofessional conduct as defined by A.R.S. § 32-1401(27)(r), which we have interpreted to capture conduct that was or might be unreasonably harmful or dangerous to the health of the patient or the public under the circumstances, *given the applicable standard of care. Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 561, ¶ 27 (App. 2002).

**¶33** The most notable change was the Board's rejection of ALJ's Conclusion 10, referring to the respectable minority doctrine, which holds that a doctor's use of a method of care does not fall below the standard of care if "a respectable minority of physicians approve the disputed technique and so long as the defending doctor properly employed that technique." *See Borja v. Phoenix Gen. Hosp., Inc.*, 151 Ariz. 302, 304 (App.

---

3       Given the amended statute's requirement of individual written justification for a modification or rejection of a finding of fact or conclusion of law, and the direction from the legislature for "heightened judicial scrutiny," we encourage the Board to provide findings of fact and conclusions of law that allow for a meaningful judicial review of the lawfulness of a decision. *See Post v. Indus. Comm'n of Ariz.*, 160 Ariz. 4, 7 (1989) (the reviewing court must be able to determine the factual basis for, and the legal propriety of, the conclusions from a decision); *Osborne v. Ariz. Med. Bd.*, 1 CA-CV 16-0250, 2017 WL 2544508, at *4, ¶ 15 (Ariz. App. June 13, 2017) (mem. decision) (for unprofessional conduct under A.R.S. § 32-1401(27)(r), an express finding that potential or actual harm is unreasonable under the circumstances "is not difficult to make, and in cases presenting a close call as to the reasonableness of harm specifically found by the Board, would assist reviewing courts in determining its adherence to the statutory standard"). This includes specific findings of fact that are not merely a recitation of the testimony, *see Douglas Auto & Equip. v. Indus. Comm'n of Ariz.*, 202 Ariz. 345, 347, ¶ 9 (2002) ("The findings must be specific, not only to encourage [the factfinder] to consider [its] conclusions carefully, but also to permit meaningful judicial review."), with material factual conflicts resolved, and in a manner that supports the conclusion, *see Shelby Sch. v. Ariz. State Bd. of Educ.*, 192 Ariz. 156, 163, ¶ 21 (App. 1998) ("[T]he reviewing court must be able to discern how the agency reached its conclusion.").

1986). Under this premise, the ALJ concluded that "[t]he Board did not establish by clear and convincing evidence that Dr. Ruben violated the standard of care approved by a respectable minority of allopathic physicians in his treatment of" the eight patients.

¶34    The Board rejected ALJ's Conclusion 10, and the subsequent conclusions that found Dr. Ruben did not violate the standard of care approved by a respectable minority. The Board's Conclusion 10 reads:

> Dr. Peairs testified that "you can say someone has subjective pain without a pain generator. However, it is the objective identifiable cause that you are treating with opioids." She further testified that it is below the standard of care of any respectable minority of any pain treating physicians in the state of Arizona to prescribe opioids when they cannot locate an objective pain generator such as an abnormal x-ray. Dr. Ashby testified that he is not aware of any physicians who believe you can use opioids even if you cannot find an objective cause of the pain, such as an abnormal x-ray or other objective test. Dr. Ashby also testified that "the pain generator is a pathologic condition that should explain the pain involved. And so the problem I saw in general with these patients is that many times they would have a minor x-ray abnormality that might explain some minor pain, but it would not explain pain needed to treat with high-dose opiates."

¶35    Dr. Ruben contends that the Board did not replace the ALJ's standard of care because the Board's Conclusion 10 was not a conclusion of law at all, it was "merely a recitation of certain opinion testimony from the State's experts." We agree with Dr. Ruben that the Board failed to properly articulate the standard in the Board's Decision. However, a professional board may rely on its own expertise for the standard of care it applies in adjudicating an allegation, so long as the licensee received notice of the standard of care that board has chosen to apply. *Gaveck*, 222 Ariz. at 438, ¶ 20 (citing *Webb*, 202 Ariz. at 560, ¶ 20; *Croft v. Ariz. State Bd. of Dental Exam'rs*, 157 Ariz. 203, 209 (App. 1988)).

¶36    The Board's conclusions were taken verbatim from its complaint, where it set forth the standard for each charge against Dr. Ruben as established by its experts' reports. Although not clearly stated in the Decision, the record supports the conclusion that the Board's view on the appropriate standard of care remained as it was in the complaint and requires a doctor to perform an adequate patient workup to identify an

objective pain generator that justifies treatment with opioids before prescribing opioids to the patient. In considering whether a pain generator warrants opioid treatment, the doctor is to consider the risks associated with opioid treatment, including: dependency, overdose, death, diversion, and interactions with other medications. Additionally, because of the substantial risks that accompany opioid treatment, the doctor must closely monitor and address "red-flag" and "drug-seeking" behaviors such as: a controlled substances report (CSPMP) that indicates a patient visits multiple pharmacies or physicians for prescriptions; patient reports of lost or stolen medication; a urine test that indicates either or both, a positive result for a medication that the patient is not prescribed or a negative result for the medication that the patient is prescribed; early refill requests; and hospitalizations for—or other indications of—substance abuse or mental health issues.

¶37            Accordingly, the Board did establish a standard of care to base its conclusions on, and that standard was provided to Dr. Ruben through the complaint and in the Board's experts' reports. Here, the Board indicated that it had reviewed the record, including the expert testimony, and rejected the notion that a respectable minority of physicians would believe the potential benefits of Dr. Ruben's treatment reasonably outweighed the risks. In the Board meeting, a Board member stated:

> You know, our foremost obligation here is to protect the public. There's a lot of discussion about -- in the ALJ's proposed order about substantial minority views about prescribing. But we have a responsibility to look at what is a substantial minority view versus what is a fringe view and quackery, frankly. It is not a minority view or any credible medical view that patients be prescribed continued doses of opioids without adequate workup, without adequate documentation of consent, without adequate monitoring, and the list goes on and on.

The Board adopted the standard set forth by its own experts and concluded—as summarized by the superior court—that "it is below the standard of care of any respectable minority of any pain treating physicians in Arizona to prescribe opioids *under the conditions that Ruben prescribed them*." (Emphasis added.) While it may have been preferable for the Board to state the standard, the way Dr. Ruben deviated from the standard, and how the deviation was unreasonably unsafe as required by A.R.S. § 32-1401(27)(r), we nonetheless find that substantial evidence supports findings of unprofessional conduct.

¶38        There is evidence supporting the Board's finding for each patient. Dr. Ruben prescribed high-doses of Oxycodone—and usually in combination with a benzodiazepine—without an adequate justification to warrant the risk involved to GM, MB, AT, and ME. Opioids are "very powerful" drugs with dangerous side effects including addiction. Prescribing opioids—such as Oxycodone—in high doses, above 80 mg per day, exponentially increases the risk of accidental overdose death. Additionally, benzodiazepines, including Valium and Xanax, are central nervous system depressants. A strong justification is needed to prescribe a benzodiazepine along with an opioid, because the combination also increases a patient's risk of death.

¶39        Dr. Ruben does not deny prescribing Oxycodone in fatal quantities, up to three hundred 30 mg tablets a month along with Xanex, to GM, a patient who had been hospitalized several times for depression and attempted suicide while under his care. The record also indicates that Dr. Ruben doubled MB's Oxycodone dose without a substantial increase in the patient's reported pain level or any other justification to warrant such an increase. Dr. Ruben prescribed a high dose of an opioid to AT, who Dr. Ruben knew was a bus driver and had congestive heart failure. Dr. Ruben's treatment of AT not only posed an unreasonable risk to AT, but also to the motoring public. ME was taking oxygen for chronic obstructive pulmonary disease, she had low oxygen in her blood and was oxygen dependent. Dr. Ruben prescribed Valium along with Oxycodone. Dr. Peairs testified that such a combination created an unreasonable risk of harm for ME because it perpetuated her oxygen dependence and placed her at risk of death.

¶40        Dr. Ashby testified that one 30 mg tablet of Oxycodone has a street value of approximately $20–25, and the risk of diversion is high. Dr. Ruben failed to adequately address red-flag behaviors indicating possible diversion with PG and FS. Dr. Ruben prescribed PG Oxycodone in large quantities, provided early refills, and provided refills in instances of stolen medication. Dr. Ruben was also aware of allegations PG shared her medication with others and that she was accused of selling her medication. Dr. Ruben obtained a CSPMP for FS at the initial visit. Despite the report showing that FS had obtained 959 Oxycodone 30 mg tablets in the previous three months, Dr. Ruben prescribed Oxycodone for FS. And Dr. Ruben prescribed escalating doses of Oxycodone for FS despite a report of stolen medication and an incident with an altered prescription.

¶41        Dr. Ruben failed to adequately monitor CD and DB who exhibited red-flag behaviors for substance abuse. The urine test from CD's

initial visit with Dr. Ruben was positive for marijuana and benzodiazepines, which had not been prescribed, and CD repeatedly requested early refills after taking more Oxycodone than prescribed. A CSPMP shows that CD filled Dr. Ruben's prescriptions at three different pharmacies. Finally, DB received a prescription for Oxycodone from Dr. Ruben despite red-flag behaviors such as reporting that he took Oxycodone that was not prescribed and testing positive for methadone and marijuana. Dr. Ruben continued to prescribe Oxycodone to DB even after a urine test that was positive for benzodiazepines without explanation from the CSPMP or evidence from Dr. Ruben's notes that he noted the red-flag behavior and had a medical justification to disregard the illicit drug use.

¶42        With each patient, the facts support the conclusion that Dr. Ruben created an unreasonable risk of harm by prescribing opioids and other medications to high-risk patients without adequately assessing the risk such treatment posed to the patient and the public. The disregard for patient and public safety supports the Board's conclusion that Dr. Ruben's conduct was unprofessional and in violation of the standard of care.

## ATTORNEY'S FEES

¶43        Dr. Ruben requested attorney's fees pursuant to A.R.S. §§ 12-348 and -349. Because he is not the prevailing party, we decline to award attorney's fees.

## CONCLUSION

¶44        For the foregoing reasons, the Board's Decision is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA

17